# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DAVID ALAN WESTERFIELD,
Defendant and Appellant.

S112691

San Diego County Superior Court
SCD 165805

February 4, 2019

Chief Justice Cantil-Sakauye authored the opinion of the court, in which Justices Chin, Corrigan, Liu, Cuéllar, Kruger, and Slough* concurred.

---

*      Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. WESTERFIELD

S112691

Opinion of the Court by Cantil-Sakauye, C. J.

A jury convicted defendant David Alan Westerfield of the 2002 first degree murder of seven-year-old Danielle Van Dam. (Pen. Code, § 187, subd. (a).[1])  It found true the special circumstance that the murder was committed during a kidnapping.  (§ 190.2, subd. (a)(17).)  The jury also found defendant guilty of the kidnapping of Danielle, a child under the age of 14 (§§ 207, 208, subd. (b)), and misdemeanor possession of child pornography. (former § 311.11, subd. (a).) Following the penalty phase of trial, the jury returned a verdict of death.  The trial court denied defendant's motion for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)) and sentenced him to death on the murder count.  The trial court sentenced defendant to a prison term of 11 years for his conviction of kidnapping, which it stayed pursuant to section 654.  Defendant was sentenced to time served for his child pornography conviction.

This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment in its entirety.

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

# I. FACTS

## A. Guilt Phase

### 1. Overview

On the night of Friday, February 1, 2002, Damon Van Dam put his two sons and his seven-year-old daughter, Danielle, to bed. His wife, Brenda, went out with her girlfriends to a bar where they saw defendant, David Westerfield, who lived two doors down from the Van Dams. When Brenda, her girlfriends, and two male friends came home, they noticed an alarm monitor was flashing, and the side garage door was open. They closed the door and had something to eat. Damon got up and joined them. After the friends left, Brenda and Damon went to bed. Sometime later during the night, Damon awoke and noticed an alarm monitor flashing. He went downstairs and noticed the door to the backyard was open. He closed it and made sure the other doors were closed. He went back to sleep without checking on the children. The next morning, Danielle was missing. A neighborhood search failed to find her, and defendant was not at home.

Defendant spent the weekend after Danielle's disappearance driving around in his motorhome away from his house in the Sabre Springs neighborhood of San Diego to various state parks outside the San Diego area. He had awkward encounters with rangers and volunteers who worked at the Silver Strand state park near the city of Coronado.

On Monday morning, defendant arrived in his motorhome at his neighborhood dry cleaner's shortly after the business opened to have bedding and a jacket cleaned. Although it was a cold morning, he was wearing a thin T-shirt, thin shorts, no shoes, and no socks.

An examination of the forensic evidence revealed that the jacket that defendant left at the dry cleaner's contained Danielle's blood. Danielle's blood was also found on the carpet of defendant's motorhome between the bathroom and the closet; her handprint, including several associated fingerprints, was on a cabinet above the motorhome's bed. Hairs consistent with Danielle's DNA profile were found in the bathroom of defendant's motorhome and at his residence in his washing machine, dryer, and on the bedding from his master bedroom. Fibers matching others later found with Danielle's body were discovered in defendant's motorhome, SUV, laundry, and bedding. Fibers similar to those from the carpeting in Danielle's bedroom were found by the bed, in the bathroom, and in the hall of defendant's motorhome. Hairs from the Van Dams' family dog were discovered on one of the comforters defendant dropped off at the dry cleaner's, on the hallway carpet and bathroom rug in defendant's motorhome, and in defendant's laundry.

Danielle's badly decomposed body was discovered off the side of a road in a remote part of San Diego County on February 27, 2002. Her mummified remains had been ravaged by animals, such that no sexual assault testing could be performed and no definite cause of death determined. The coroner could not rule out suffocation.

In defendant's home, officers discovered computer files containing child pornography.

Defendant principally relied on an alibi defense based on entomological evidence from Danielle's body that suggested her death occurred sometime subsequent to February 5, after defendant was under constant police surveillance.

### 2. *The Prosecution's Trial Evidence*

#### a. *The events leading to Danielle's disappearance*

A week before Danielle's disappearance, on January 25, 2002, her mother Brenda went out to a local bar called "Dad's" with her two girlfriends — Denise Kemal and Barbara Easton. They met defendant there, whom Brenda recognized as her neighbor from two doors down the street. Defendant introduced himself, and bought the women drinks. Brenda and defendant briefly spoke, but otherwise Brenda spent the time with her girlfriends.

The following Tuesday, Brenda accompanied her daughter Danielle while she sold Girl Scout cookies in the neighborhood along with her five-year-old brother Dylan. They stopped at defendant's house, and he invited them inside so he could fill out an order form to purchase cookies. While Brenda and defendant were in the dining room, Danielle and Dylan went into defendant's backyard to see his pool. When the children were outside, defendant discussed the previous Friday night and his interest in Easton and that he wanted to be introduced to her. Brenda told defendant that she and Easton might be going to Dad's again the upcoming Friday, depending on whether she could find a babysitter because her husband was planning on being away that weekend. After the children came inside, they stayed with Brenda in the dining room, and went nowhere else in defendant's house.

#### b. *The night of Danielle's disappearance*

Kemal and Easton arrived at the Van Dam house around 8:00 p.m. on Friday, February 1, 2002. Brenda and her two girlfriends went into the garage and smoked marijuana. Someone opened the garage side door to let the smoke out.

4

Brenda was uncertain whether anyone closed it. Kemal recalled closing the side door, but not locking it. The Van Dams had reversed the lock on the interior garage door leading into the house so that they could, if they chose, prevent their children from entering the garage. A person inside the garage could unlock the door without a key and enter the house.

After Brenda and her two girlfriends left for Dad's, Damon stayed home with the children, Danielle, Dylan, and Derek. Around 10:00 p.m., Damon put the children to bed for the night, each in his or her own room, and left each door ajar. Damon watched television downstairs for 20 to 30 minutes. He then went up to the master bedroom, taking Layla, the family puppy, with him. He closed the door to keep the puppy in the room and continued watching television until he fell asleep. He briefly woke up at around 1:45 a.m. to allow the puppy to relief herself in the backyard, after which he closed the door and went back upstairs.

Brenda, Kemal, and Easton were at Dad's during this time. When they arrived at the bar, defendant was already there with two of his friends. Brenda pointed defendant out to Easton, who went over to him and introduced herself. Defendant came over and bought them drinks, but they did not include him in their conversation. Sometime after 9:00 p.m., the Van Dams' friends, Rich Brady and Keith Stone, arrived. Brady and Stone joined Brenda and her friends. At one point, defendant's friends joined Brenda's group playing pool. Defendant was not part of the group but watched for at least part of the time. Later that night, around 10:30 or 11:00 p.m., the group went to Brenda's car where they smoked marijuana. When they went back inside the bar, the group started dancing. Defendant was still inside. The group left Dad's shortly before

closing at 2:00 a.m. Brenda was unsure whether defendant was at the bar when they left, although one of defendant's friends, Garry Harvey, said that defendant was gone when Harvey returned to the bar around 12:30 a.m. Brenda, her girlfriends, Brady, and Stone went to the Van Dams' home.

When Brenda entered her home, she noticed a red blinking light on the alarm monitor, indicating that there was a window or door open. Brenda and Kemal started looking for the open window or door. Upstairs, Brenda also went to tell Damon that Brady and Stone were visiting. Brenda and Kemal found that the garage side door was open. Brenda closed it and went back upstairs, where she found Easton with Damon.[2] Brenda told them to come downstairs. Brenda did not check on the children, but closed their doors due to the potential noise. Downstairs, everyone ate leftover pizza. About 20 minutes later, the guests left. Damon and Brenda locked up the house and went to bed. Damon placed Layla in Derek's room. It was around 2:30 a.m.

Sometime after 3:00 or 3:30 a.m. Damon woke again. When he got up, he noticed a red light flashing on the alarm monitor in their bedroom. He went downstairs and noticed a cold draft of air in the hallway. He found the sliding glass door to the backyard was open. He closed the door, made sure all of the other doors were closed, including the side garage door, and

---

[2] Brenda found Easton and Damon "snuggling" and kissing. In an effort to attack their credibility, the defense presented testimony that neither Damon nor Brenda had initially told officers that Damon had previously had sex with Easton in the presence of Brenda and that he had also had sex with Kemal in the presence of Brenda and Kemal's then husband. Brenda later acknowledged she had had a sexual encounter with Kemal.

checked the alarm panel. Damon went back to bed without checking on the children.

The next morning, Brenda woke and went downstairs to make breakfast and await the arrival of two neighborhood children whom she was to watch that day. Damon and the two boys were already downstairs. The neighborhood children arrived around 9:30 a.m. Because Danielle had not yet come downstairs, Brenda went to wake her. Danielle was nowhere to be found. Brenda called 911 and their neighbors, reporting that Danielle was missing. The police arrived and conducted a forensic investigation of their house that day and overnight.

### c. *The investigation of Danielle's disappearance*

By Sunday, February 3, the San Diego Police Department had set up a "command post" on the Van Dams' street. Detective Johnny Keene arrived to contact neighbors and to obtain statements concerning any information about Danielle's disappearance. He knocked on defendant's door and received no answer. The following morning, Keene returned to defendant's home upon learning that defendant had returned and other officers had spoken with him in his driveway.

Keene asked defendant about his activities that weekend. Defendant said that he awoke around 6:30 a.m. on Saturday and decided he wanted to go to the desert. He drove his Toyota 4Runner SUV to his storage location in "High Valley" where he left it to retrieve his motorhome. He drove the motorhome back to his house, where he stocked it with groceries and filled the water tank. Defendant said he left home around 9:50 a.m. When he realized that he did not have his wallet and did not have enough money to go to the desert, he instead drove to a state park called Silver Strand near the city of Coronado. When

he arrived, he filled out a registration envelope, placed money for a three-night stay inside, and parked his motorhome. A park ranger came by and told him he had overpaid by $30, apparently placing a $50 bill in the envelope. Once the ranger left, defendant said that he did not stay much longer because it was too cold. He decided, instead, to return home to find his wallet.

Defendant thought he arrived home around 3:30 p.m. He saw news vans and police activity on the street. One of his neighbors told him about the missing girl and defendant decided to check his house and pool. After he did so, he drove back to where he had left his 4Runner because he thought, as it turned out correctly, that he might have left his wallet in it.

Once he had his wallet, defendant put gas in his motorhome and drove the "back way" to Glamis, a sand dune area about 160 miles away. He estimated that he arrived around 10:00 or 10:30 p.m. Defendant did not bring with him any of his "sand toys," meaning the vehicles he usually drove on the sand dunes. He pulled into a spot for the night, but got stuck in the sand. He spent the night there and began digging himself out the next morning. Eventually someone came by and towed him out of the sand.

Defendant said that once he was out of the sand, he left Glamis and drove to a place called Superstition Mountain to see if it was a place he would want to take his son camping. He continued on to Borrego Springs, where he once again got the motorhome stuck in the sand. Defendant estimated that he left Borrego Springs about 6:00 p.m. after digging himself out. He drove back to Silver Strand, but arrived too late to gain admittance to the park. Defendant said that he parked the motorhome for the night across the street in a parking lot at

Coronado Cays. He woke up early, around 4:00 a.m., and drove back to High Valley. But thinking it was still too early to park his motorhome and retrieve his 4Runner, he drove straight home. The police arrived a short time later.

Keene asked defendant about his night at Dad's on Friday, February 1. Defendant mentioned seeing Brenda there and that her husband told her he felt their daughter was growing up too quickly. Defendant paused and then said, "I could have sworn she said she had a babysitter. I didn't know her husband was home with the kids." Keene had not asked a question to prompt such a response.

Defendant told Keene that he left Dad's around 11:00 or 11:30 p.m. that night, drove home, and went to bed. When asked about other previous interactions with Brenda, defendant told Keene about meeting Brenda at Dad's the week before and buying Girl Scout cookies from Danielle the previous week. Defendant said that while he was filling out the cookie order form and speaking with the Brenda, the kids were "running all over the house."

Keene asked defendant if it was okay to look inside his house, 4Runner, and motorhome. Defendant said it was, and signed consent forms for all of them. Once inside defendant's home, Keene immediately noticed how immaculately clean it was. Keene noted that the master bed did not have a comforter on it, but was otherwise made with sheets. During their search, Keene believed defendant was overly cooperative, pointing out places that the detectives had missed. Keene and Parga looked at defendant's 4Runner, which was parked in the garage. It seemed very clean inside and out. Parga detected the smell of bleach in the garage.

Defendant led the detectives to High Valley where he stored his motorhome. Defendant unlocked all of the storage compartments on the outside of the motorhome and even pointed out that they had failed to check one smaller compartment. When they went inside, Keene observed that the motorhome bed, like the master bed, had no comforter. After they inspected the motorhome, defendant pointed out the trailer that contained his dune buggy, quad runners, and various equipment, offering it for inspection as well. When the detectives were finished, they all returned to defendant's house.

Defendant consented to be interviewed at the police station. During the subsequent interview with San Diego Police Officer Paul Redden, defendant again described his weekend activities. As he recounted one stop he made, defendant told Redden that it was "this little place that *we*, where *we* were was just a little small turn type place." (Italics added.)

Keith Sherman owned the property where defendant stored his motorhome and sand vehicles. He testified that on Saturday morning, February 2, 2002, defendant came to collect it. Sherman intended to go out and offer to move his own motorhome out of the way so defendant could move the trailer he used to carry his sand vehicles, but defendant was already pulling away. Unusually, defendant was not with his son, but was alone. It was also unusual that defendant left his 4Runner on the property and did not take his trailer. Defendant brought his motorhome back around 7:30 a.m. on Monday.

At the Silver Strand beach, on Saturday, February 2, 2002, several other campers noticed defendant's motorhome. When defendant's motorhome pulled into its camping spot, someone immediately closed the front curtains across the

windshield. All of the other curtains were also closed. No one came out to set up anything for camping. Contrary to defendant's description, the weather was cool, but nice.

State Park Ranger Olen Golden noticed that defendant had placed $54 in his registration envelope when only $24 was due. State Park Ranger Brian Neill went to defendant's motorhome to return the overpayment. Neill also noticed that the curtains were drawn so that he could not see inside, and nothing was set up outside the motorhome. Neill knocked on the door, but no one immediately responded. He had started back to his vehicle when defendant emerged. Defendant immediately shut the door behind himself. Neill informed defendant that he had overpaid. Defendant insisted that he had not, but Neill returned the extra money to him. Defendant remained outside while Neill walked back to his vehicle. Minutes after Neill left, defendant drove off in his motorhome. He approached a volunteer who worked at the Silver Strand and continued to insist he had not overpaid. Contrary to the narrative defendant told Detective Keene in which he claimed he had misplaced his wallet, the volunteer saw defendant pull out his wallet and show the volunteer that he had only $20 bills.

In Glamis, where defendant drove next, other visitors noticed that defendant's motorhome had been driven unusually far off the road, close to the sand dunes, where it became stuck in the sand. On Sunday morning, defendant tried to convince other campers to tow him out, but they were unwilling or unable to help him. Don Conklin, a Glamis resident who provided tow services, arrived to help defendant. Conklin successfully pulled defendant's motorhome out of the sand. But when Conklin went to retrieve defendant's ramps and the shovel that they had used in the towing process, he could not return them to defendant

because defendant had driven away immediately after being towed.

Julie Mills knew defendant as a longtime customer of Twin Peaks Cleaners in Poway, where she worked. According to Mills, defendant arrived at the dry cleaner's on Monday, February 4, 2002, between 7:00 and 7:30 a.m. Although it was cold, defendant was wearing very thin shorts, a very thin T-shirt, with no shoes and no socks. Defendant brought to be cleaned a sport jacket, a couple of comforters, and some other bedding. Several things struck Mills as unusual. Mills had never before seen defendant dressed in this manner. Defendant was not his usual talkative self and would not look her in the eye. Defendant also arrived in his motorhome, which she had never seen him do before. Defendant had not mentioned a trip to the dry cleaner's in his recounting of his weekend to Detective Keene.

Defendant made a second trip to the dry cleaner's that same day around 1:40 p.m. He arrived in his 4Runner. He dropped off a sweater, pants, and a T-shirt, requesting same day service. He again acted differently from normal, not smiling or chatting.

Jim Frazee, a volunteer canine handler from the San Diego Sheriff's Department, and his trained search and cadaver dog Cielo, searched defendant's motorhome. Cielo "alerted" to the first storage compartment behind the passenger's door; an area where air from inside the motorhome would naturally escape. When the storage door was opened, Cielo showed "interest" in a shovel and lawn chair that were inside. According to Frazee, Cielo's alert indicated that a body had been somewhere in the motorhome.

### d. The discovery of Danielle's body and other forensic evidence

Karsten Heimburger was part of a volunteer search party looking for Danielle. On February 27, 2002, he discovered the nude, decomposed body of a young girl, lying on her back in the dirt off the side of Dehesa Road, a desert-type area of open space. The body was identified as Danielle based on her dental records.

San Diego County Medical Examiner Dr. Brian Blackbourne arrived at the Dehesa Road location the night of February 27, 2002. He observed the Danielle's body was in a state of marked decomposition. Her body had been extensively fed upon by animals so that much of her body tissue was missing. Her left foot was missing, as was her genital area. Her skin was mummified. Danielle was wearing no clothes and none were in the immediate area. At the autopsy the following day, Blackbourne attempted to determine a cause of death. He ruled out stabbing, gun shot, blunt force trauma, strangulation, and disease, but could not rule out suffocation. He concluded the death was a homicide. Blackbourne could not determine whether Danielle had been sexually assaulted because her genital organs were gone. He stated that Danielle had been deceased for a considerable period of time. He believed she had died at least 10 days prior to being found and as much as six weeks earlier.

Jeffrey Graham, Jr., a latent fingerprint examiner for the San Diego Police Department, was able to obtain Danielle's fingerprints. He compared them to a set of prints lifted from defendant's motorhome. One handprint, lifted from a cabinet 10 inches above the motorhome bed, contained four associated fingerprints, two of which contained sufficient ridge detail to match two of Danielle's fingers on her left hand. It was apparent

from the way the print had been left that Danielle was moving when it was made, that is, her hand did not simply make the print and then lift back up.

San Diego Police Department criminalist Sean Soriano examined stains on the jacket defendant had left at the dry cleaner's. Three stains on the jacket presumptively tested positive for the presence of blood. San Diego Police Department forensic biologist Annette Peer located a stain on the carpeted floor between the bathroom and closet of defendant's motorhome that also presumptively tested positive for blood. Peer tested a cutting of the bloodstain found on the shoulder of defendant's jacket for 13 genetic markers, and the 13-marker DNA profile of the bloodstain on the shoulder area of defendant's jacket matched Danielle's 13-marker DNA profile. Peer testified that the expected frequency of that identical 13-marker DNA profile in the Caucasian population is approximately one in 670 quadrillion.

Forensic scientist Mitchell Holland, of the Bode Technology Group, tested cuttings of the bloodstain located on the carpet for defendant's motorhome for 13 genetic markers, and the 13-marker DNA profile of that bloodstain matched Danielle's 13-marker DNA profile. Holland testified that the expected frequency of that identical 13-marker DNA profile in the Caucasian population is approximately one in 660 quadrillion of unrelated persons.[3]

---

[3] Before Holland's testing, Annette Peer of the San Diego Police Department had tested a different cutting of the bloodstain located on the carpet of defendant's motorhome. Her testing did not return a complete 13-marker genetic profile,

Holland also conducted nuclear DNA testing on a hair root extracted from a hair recovered from the sink drain in defendant's motorhome bathroom and obtained a partial profile that matched Danielle's DNA profile. The DNA test for that hair root returned results for 12 out of the 13 tested genetic markers. Although the missing genetic marker resulted in a lower rarity statistic than that of a full 13-marker DNA profile, Holland testified that the expected frequency of that 12-marker DNA profile in the Caucasian population, nonetheless, is one in 25 quadrillion of unrelated persons.

Catherine Theisen, employed at the Federal Bureau of Investigation laboratory in Washington, D.C., conducted mitochondrial DNA[4] analysis on several hairs discovered in defendant's motorhome. She could not exclude Danielle as the source of a hair recovered from the bathroom rug of the motorhome. Holland conducted mitochondrial DNA testing on two hairs collected from defendant's washing machine and dryer, six hairs collected from the defendant's master bedroom bedding, and one hair recovered from defendant's motorhome hallway carpet. All of the hairs contained the same mitochondrial DNA profile as Danielle.

---

resulting in a lower rarity statistic of one in 130 quadrillion persons within the Caucasian population.

[4] Theisen explained that nuclear DNA is inherited from both the mother and father. It confers a unique identity. Mitochondrial DNA in inherited only from the mother. It is, therefore, shared with siblings, the mother, the mother's siblings, and anyone else related in the maternal line. Nevertheless, mitochondrial DNA is extremely useful in analyzing items of evidence that contain little nuclear DNA, such as hair that does not have the hair root attached.

San Diego Police Department criminalist Tanya Dulaney collected fiber trace evidence in this case. Dulaney discovered in defendant's motorhome blue fibers on the kitchen bench seat, on the upholstered headboard, on the couch, and on the front passenger seat. Chemical analysis revealed that all of these blue fibers were consistent with fibers discovered with Danielle or in the sheet used by the medical examiner to wrap Danielle's body for the purpose of collecting potential trace evidence that might fall off the body when it was removed from the Dehesa Road location.

Dulaney also collected at defendant's residence many orange and blue fibers from clothing found on top of, and inside, defendant's washing machine and dryer. She found similar orange fibers on the pillow cases from his master bedroom. Jennifer Shen, another San Diego Police Department criminalist, found more orange fibers inside defendant's 4Runner and on a towel discovered inside a laundry bag in his 4Runner. Entangled in the necklace on Danielle's body was an orange fiber similar to the orange fibers found on defendant's laundry, bedding, and in his vehicle.

Dulaney also collected tan fibers from the area by the bed, in the bathroom, and in the hall of defendant's motorhome, which, when examined, were consistent with fibers from the carpeting in Danielle's bedroom.

James Watkins, Jr., a law enforcement computer forensic examiner, copied and examined images found on the computer hard drives and other computer-related material located in defendant's bedroom and home office. He discovered 85 images and 39 movies that he deemed "questionable," meaning they depicted children under the age of 18 in sexual acts that might

constitute child pornography. He also discovered two "anime" files that contained two storyboard-type drawings of young girls being abducted, bound, and raped.

### 3. Defense Evidence

The defense called several witnesses to testify regarding defendant's habits and customs regarding his motorhome, including that he would leave it unlocked when it was parked by his house, that he had on other occasions made similar trips by going first to Silver Strand and then to the desert, that he did not always take the trailer with his "sand toys" with him, that he sometimes went alone, and that getting stuck in a desert wash was not uncommon.

The defense called several witnesses who were at Dad's bar on the night of February 1, 2002. They testified to seeing Brenda and her girlfriends drinking, dancing in sexually suggestive manners, and flirting. Brenda was seen rubbing up against defendant as she danced with him.

Defendant challenged the prosecution's physical evidence by emphasizing that fingerprint identification cannot establish when or under what circumstances a print was made, biochemical analysis cannot determine how or when a biological fluid was deposited, and trace evidence of fibers and hairs are highly mobile, easily transferred, and can be consistent with an indirect or derivative contact. The defense pointed out that the fibers found were not unique.

The defense questioned the "alert" by Cielo, the search and cadaver dog handled by Jim Frazee, to the side compartment of his motorhome. The defense also queried why Frazee had not reported the alert when it was supposedly made, but waited

until after defendant's arrest, when Frazee sent an email describing it to two friends and Cielo's breeder.

Defendant relied heavily on an alibi defense based on entomological evidence suggesting that Danielle's body could not have been placed at the Dehesa Road site until a date after defendant was either in actual contact with police or under constant police surveillance. Specifically, defendant was almost constantly in police presence beginning around 9:00 a.m. on Monday, February 4, 2002, until his arrest on February 22, 2002. He did not go near the Dehesa Road site during this time. David Faulkner, a forensic entomologist called by the defense, attended Danielle's autopsy where he collected insects from her remains and later went to the Dehesa Road site to assess insect activity. He testified that such insect information can be used to approximate time of death or the post-mortem interval. In Faulkner's expert opinion, based upon the age of the insect material he collected, as well as the known temperature and weather conditions at the time, the insect activity on Danielle's body would have occurred 10 to 12 days prior to the recovery of her remains on February 27, 2002. That is, the body was first available for exposure to insect activity between February 16 and 18, 2002. The defense also called forensic entomologist Neal Haskell, who opined based upon the age of the insect material he received from Faulkner, Faulkner's trial testimony, as well as data regarding weather conditions at the time, that Danielle's body would have been first available for exposure to insect activity between February 14 and 21, 2002.

Marcus Lawson, a computer forensics expert testified that he found pornographic images on the computers belonging to defendant's son, Neal Westerfield.

18

### 4. Prosecution's Rebuttal

To rebut the defense entomological evidence, the prosecution called forensic anthropologist William Rodriguez. Rodriguez specialized in assessing human skeletons in difficult cases, such as where the body is decomposed, in an effort to identify the deceased as well as to determine the manner and cause of death. Rodriguez noted that Danielle's body was mummified to a high degree, which can happen very quickly with the body of a small child. Rodriguez explained that mummification slows the decomposition process. He related that insects will either not be able to penetrate a mummified body or, if inside, would die for lack of nutrients. But if animals feed on a mummified body, the body can be opened for insect activity. Rodriguez testified that it is difficult to estimate accurately how long an individual has been dead because many variables are involved in the decomposition process, including weather, sunlight, and insects. He believed it is important to use various methodologies, and not just entomology, which on its own can suggest only a minimum post mortem interval. Based on his review of all of the data, reports, and testimony, Rodriguez opined that Danielle had been deceased four to six weeks when she was found, i.e., she died sometime earlier than February 6, 2002.

The prosecution also called forensic entomologist Madison Lee Goff. He testified that determining how long a body has been deceased is not possible by employing forensic entomology. That process, he explained, can be used only to determine a minimum time the body would have been available for insect activity. Goff also noted that the presence and extent of insect predators and scavengers of the body could alter the rate of decomposition of the body and affect the entomological analysis.

Based on his review of all of the data, reports, and testimony, Goff opined that the earliest date Danielle's body would have been available for exposure to insect activity was February 12, 2002. There was no way to determine the latest date. By employing the tools of forensic entomologist, he was unable to say that Danielle had been alive from February 1 through February 12, 2002.

### 5. *Defense Surrebuttal*

Forensic entomologist Robert Hall reviewed the same information as the other experts and opined that the insect activity on Danielle's body began no earlier than February 12, 2002, and no later than February 23, 2002. He testified that insect activity would begin almost immediately upon the body being dumped in the location where it was found.

## B. Penalty Phase

### 1. *Prosecution's Case in Aggravation*

In addition to relying on the evidence admitted during the guilt phase, the prosecution introduced evidence at the penalty phase relating to an act of uncharged lewd conduct by defendant, as well as victim impact testimony.

### a. *Uncharged Lewd Conduct*

J.N. is defendant's niece. J.N. testified that when she was between five and seven years old, she was sleeping in an upstairs bedroom, with her sister and cousin, while her parents were having a party downstairs. At some point, J.N. woke up. She realized defendant was there and that he had his fingers in her mouth. J.N. described defendant as rubbing or massaging her teeth. J.N. pretended to be asleep and rolled over. J.N. saw defendant walk over to her sister, but she could not tell what he was doing. Defendant came back and again put his fingers in

J.N.'s mouth. J.N. bit down on defendant's hand. Defendant moved over to where J.N.'s cousin was sleeping. J.N. watched to see what defendant was doing. She saw him adjust the sides of his shorts before leaving the room.

A short time later, J.N. went downstairs and told her mother that "Uncle Dave [defendant] was in the room and he was being weird and it bothered me [J.N.]." J.N. did not tell her mother anything more because she was scared. Her mother confronted defendant, but after a short talk, thought nothing more of the situation.

Officer Paul Redden testified about an interview he had with defendant. Redden testified that defendant was concerned regarding an incident that had occurred in 1994. Defendant told Redden about the incident J.N. described. Defendant claimed that on the night of the incident, he had heard a commotion upstairs where J.N., her sister, and cousin were sleeping. Upon entering the room, defendant found one girl with her foot in the other girl's pajamas. Defendant separated the girls and went downstairs. Defendant stated that approximately a week later, J.N.'s mom accused defendant of molesting J.N.. A recording of the interview was played for the jury.

### b. Victim Impact Evidence

The prosecution called Danielle Van Dam's kindergarten/first grade teacher, Amy De Stefani, and second grade teacher, Ruby Puntenney, as victim impact witnesses. Both spoke of Danielle's intellect, curiosity, and compassion, with Stefani saying Danielle was "just a very caring little girl. She wanted to make sure that nobody else had their feelings hurt. . . . She got along with everyone."

Thereafter, Danielle's father took the stand. Damon was involved in his daughter's education, both participating at her school and tutoring Danielle at home. He said Danielle enjoyed helping him around the house with chores. Damon also testified about an upcoming father-daughter dance he had planned to attend with Danielle. Damon spoke about his emotions when he discovered Danielle was missing. He described how he became less and less hopeful that she would be found and how he would have emotional outbursts in front of his friends when contemplating the possibility that Danielle might never be found. He explained how he felt when her body was found.

Damon described how Danielle's brothers handled their sister's death. Dylan (her younger brother) became more childish, needing to sleep with his parents or brother. Her older brother, Derrick, became "introverted and clammed up a lot." Damon testified that Derrick now suffers from emotional outbursts, and the whole family sought therapy after Danielle's disappearance.

Finally, Danielle's mother, Brenda, testified that she volunteered for school projects, planned parties, and attended Danielle's class to spend time with her daughter. Brenda testified that Danielle loved writing and math, was involved in the Daisies (a precursor to the Girl Scouts), and was a dancer, as well as a piano player. Brenda confirmed Damon's testimony that her sons had become emotionally distraught over Danielle's death. She explained how difficult it was for her to walk past defendant's house and past her daughter's room every day.

### 2. *Mitigating Evidence*

The defense introduced evidence describing defendant's involvement as a design engineer with the creation and

development of various new technologies, including important medical rehabilitation devices. In addition, the defense introduced testimony of friends and family members who could speak to defendant's character.

### a. Defendant's Engineering Contributions

Ron Lawrence, David Petch, and William Townsend were defendant's co-workers at various companies. Each testified that defendant played an important role in the creation, design, and development of medical devices at their companies.

Carmen Genovese was a former supervisor of defendant. According to Genovese, defendant played a crucial role in leading design teams that significantly contributed to the development of medical devices for joint rehabilitation and optical lenses. He testified that these devices were exceptionally important and improved the life of a great many people. Genovese also described a significant security device designed by defendant.

Judy Ray was the owner of a company that employed defendant. She spoke of defendant's important contributions to her company, including the design of a shoulder rehabilitation device that helped more than 600,000 people.

### b. Defendant's Friends and Family

Susan L. was defendant's former girlfriend. Susan and her daughter, Christina G., along with Christina's one-year-old son, lived with defendant for a year. Susan testified that defendant helped rescue Christina from an abusive relationship and allowed her and her infant son to live with them. Defendant also planned and threw Christina's son a birthday party because Christina could not afford to do so.

Margaret Hennon was defendant's high school sweetheart. Defendant's family and Hennon's family were very close. Hennon testified that she loved defendant and he was important to her, although she admitted that she had not seen or spoken to defendant in person since 1973 or 1974.

Several of defendant's friends and neighbors testified to his importance to their families. They testified that defendant was always helpful. He would go above and beyond to assist whenever needed. Defendant was considerate and protective of his own and other children. Defendant was a positive influence in their children's lives.

The defense also called a number of defendant's family members to testify. Defendant's younger sister, Tania P., spoke about defendant's upbringing and noted that defendant worked to put himself through college. Tania testified that traditional family values were very important to defendant. She said defendant was protective of her. Several of defendant's aunts testified concerning their association with defendant over the years. Defendant's children, Neal and Lisa, both described how much they loved and missed their father. They described themselves as a close family. Neal testified that his father taught him to do the right thing and accept responsibility for his actions.

## II. DISCUSSION

### A. Guilt Phase Claims

#### 1. Denial of Defendant's Motion to Suppress Evidence Obtained Pursuant to Five Search Warrants

Defendant filed a pretrial motion to suppress the evidence law enforcement obtained pursuant to five search warrants, claiming the warrants were illegally obtained in violation of his

Fourth Amendment rights. Among other things, defendant argued that his purported failure of a polygraph examination was improperly considered by the magistrate as part of the prosecution's showing of probable cause. The trial court denied the motion, finding the warrants were supported by probable cause. With respect to the foundational first warrant, the court ruled that the magistrate had properly considered the polygraph evidence offered in support of the warrant, but also found that even if the evidence to which defendant objected was excised, there was still sufficient probable cause for the warrant's issuance. Moreover, the court further concluded that even if probable cause was lacking for the first warrant, the search following its issuance was justified based on defendant's consent.

The trial court, however, granted defendant's motion to suppress, under the Fifth Amendment, statements he made to detectives just before he signed a consent-to-search form and before the execution of the first warrant. The court found that defendant had made those statements in circumstances under which no reasonable person would have felt free to leave and without being advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

Defendant claims on appeal that the trial court erred in denying his motion to suppress the evidence law enforcement obtained pursuant to the five search warrants. He argues that the first warrant was erroneously based on consideration of his failure to pass a polygraph examination. He argues both statutory and constitutional error, and contends that without the polygraph results, there was insufficient evidence of probable cause. Defendant asserts that the first search was not otherwise justified by the good faith reliance of the police on the

magistrate's issuance of the warrant. And, finally, he contends that his consent to the search in question was not freely given and that concluding otherwise is incompatible with the court's determination that his statements to detectives should be suppressed under *Miranda*. Because the results of the first search were relied upon to obtain the subsequent four warrants, defendant contends the evidence from all five warrants should have been suppressed.

As explained below, we conclude the trial court properly denied defendant's motion to suppress. Probable cause supported issuance of the first search warrant even without consideration of the polygraph results. Therefore, we need not reach defendant's claims regarding the propriety of the magistrate's consideration of polygraph results as part of the probable cause showing for issuance of a search warrant. Moreover, because the first search was valid, the subsequent warrants and searches were as well. Finally, given these conclusions, we need not reach whether the first search was justified by the good faith reliance of the police on the magistrate's issuance of the warrant or whether the trial court's finding of voluntary consent provided an alternative basis for the first search.

### a. The affidavits supporting the warrants

#### 1. The first warrant

At approximately 2:00 a.m. on Tuesday, February 5, 2002, Detective Alldredge telephonically obtained a warrant from Judge Cynthia Bashant to collect biological samples from defendant and to search his house and three vehicles — his SUV, motorhome, and trailer. In a conference call, Alldredge testified under oath before Judge Bashant in response to

questioning by a deputy district attorney. At the end of Alldredge's testimony, Judge Bashant decided to issue the warrant. A transcript of Alldredge's testimony was later attached to the warrant.

As set out in that transcript, Allredge testified that Danielle Van Dam was "now considered to be abducted" and provided the details of her disappearance on February 2, 2002. He explained that the police responded and completed a door-to-door check of the neighborhood looking for Danielle. During the initial survey, most of the other immediate neighbors were at home and contacted, but defendant, who lived two houses away from the Van Dams, was not home. Alldredge further noted that the police conducted a second canvas of the neighborhood on February 3, 2002, and defendant was still not home.

Alldredge testified that he learned from Danielle's mother, Brenda Van Dam that she had previously met defendant twice at a local bar, including on the night before Danielle's disappearance. Brenda also told Alldredge that she and Danielle had been inside defendant's house a few days before Danielle's disappearance to sell girl scout cookies.

Allredge explained that the police first made contact with defendant when he came home the morning of February 4, 2002. Defendant gave them written consent to search his house and motorhome, including a dog scent search. The dog twice displayed an interest toward the garage door, although it was not enough to be considered an "alert." In response, defendant explained that Danielle and her brother had recently been in his home while selling girl scout cookies and that they had run around inside the house, including upstairs, downstairs, in the garage, and outside to visit the pool. The officers again

contacted Brenda, and she confirmed that the children had neither entered the garage nor had gone upstairs.

Alldredge testified that officers then searched defendant's motorhome, which was parked about 30 miles away in Poway, California. According to the detectives, defendant displayed an unusual amount of cooperativeness during the search by opening drawers, lifting cushions, and pointing out areas missed by the detectives.

Alldredge further testified that on February 4, he participated in a phone conversation with Federal Bureau of Investigations (FBI) agents known for profiling abductors. According to the FBI profilers, a person involved in an abduction often may offer to help officers or display excessive cooperation. Further, according to a 10-year study, most abductions of children ages five and above are for sexual purposes. The abductors are mostly males who either live close to the victim's residence or are an acquaintance of the victim's family. The profilers believed it was highly unlikely that a complete stranger abducted Danielle because of the high risk of entering an unknown residence to take a victim. The profilers also thought the perpetrator was someone familiar with the inside of the Van Dam home. According to Alldredge, defendant's house was similar to the Van Dam's home.

Alldredge testified that in an interview with Detective Keene, defendant described encountering Brenda at the local bar on the night before Danielle's disappearance. Contrary to Brenda's description of that same encounter, defendant told Detective Keene that Brenda had discussed her daughter Danielle. Defendant said that Brenda had mentioned an upcoming father-daughter dance at school, that she had bought

a new blouse for Danielle, and that Danielle's father was concerned about how fast his little girl was growing up. According to Keene, "out of the clear blue sky" defendant stated that Brenda had told him a babysitter, and not her husband, was watching her children that night. Keene knew that Danielle's father Damon had been watching the children, although this was not common knowledge. Often the Van Dams would have a babysitter watch the children on Friday nights.

Alldredge testified that a detective recontacted Brenda and confirmed that she had not told anyone about the upcoming father-daughter dance. According to Brenda, the only persons who were aware of the dance were immediate family members and one neighbor, not defendant.

Alldredge testified that defendant also described to detectives the trip he took on the weekend of Danielle's disappearance, including how he, on the morning of February 2, 2002, had driven to Poway to pick up his motorhome from storage. Alldredge noted that a neighbor had told detectives that defendant's motorhome was parked in the neighborhood the night prior to February 2. In one part of his police interview, Alldredge recounted, defendant said to a detective that "we drove back to Silver Strand." Defendant's reference to "we" suggested someone else was in the motorhome with him. However, when questioned as to why he said "we," defendant responded that it was "just a slip."

Alldredge also explained that detectives spoke with a park ranger at the Silver Strand camping spot. The ranger described how defendant had behaved suspiciously when the ranger tried to return defendant's overpaid camping fee by preventing the ranger from seeing inside the motorhome.

Alldredge finally testified about defendant having completed, and failed, a polygraph examination. During the examination, defendant was asked whether he was involved in or responsible for the disappearance of Danielle and whether he knew her location. Although defendant answered "no" to each question, the polygraph examiner found defendant had been deceptive in each response.

Based on this testimony provided by Alldredge over the telephone, Judge Bashant found the existence of sufficient probable cause and authorized a search warrant as requested. The warrant was issued at 2:28 a.m. on February 5, 2002.

### 2. *The second warrant*

Detective Alldredge prepared a second affidavit in support of a search warrant later on February 5, the same day the first warrant was issued and executed. Alldredge declared that during the course of the first search, computer forensic examiners saw "in plain view" three CD's and three computer diskettes. The items were marked by the letters "X" and "XO," which based on the examiners' prior experience, indicated they may contain pornographic material. Following defendant's written consent to search his entire residence and all of its contents, the examiners inserted the media into their own computers. They discovered "possible child pornography with minors engaged in sexual activity with each other and adults." Based on the items discovered, the examiners believed that defendant's computer might have child pornography stored on it as well. A second warrant was issued authorizing the search of defendant's computer and its files, as well as computer disks and other forms of media "depicting nudity and/or sexual activities,

whether real or simulated, involving juveniles, juveniles with juveniles, and juveniles with adults."

### 3. *The third warrant*

The next day, February 6, 2002, Detective Johanna Thrasher applied for a third search warrant requesting defendant's cell phone records, including the location from which calls were made and received between February 1 and February 4, 2002. She stated that defendant had made several inconsistent statements regarding his whereabouts the night of Danielle's disappearance. Defendant had also told investigators that he used his cell phone at different times during the weekend after her disappearance to contact his son and ex-wife about his plans and activities. Thrasher stated that by obtaining defendant's cell phone records, investigators could corroborate or disprove defendant's account concerning where he was when calls were made. In support of her application for the warrant, Thrasher relied on the facts demonstrating probable cause for the first and second search warrants, as well as the results of the search in which child pornography was found in defendant's home. Judge Bashant issued the requested warrant.

### 4. *The fourth warrant*

On February 7, 2002, Detective Terry Torgersen, applied for a fourth warrant to search any clothing and bedding that defendant had taken to Twin Peaks Cleaners. Torgersen presented the same factual basis for probable cause as previously submitted with the additional information that two dry cleaning receipts had been found during the search of one of defendant's vehicles. Torgersen stated that defendant admitted to investigators that he dropped off items at the Twin Peaks

Cleaners on Monday morning, February 4, 2002. Employees at Twin Peaks Cleaners were contacted and told Torgersen that defendant was one of their long-time customers. One of the employees said that defendant had showed up at the cleaners much earlier than usual on the morning of February 4 and had asked for "same day service," which he had never done before. The employee noticed that defendant was dressed in short pants, a shirt, and no shoes. She commented to defendant that this was unusual on such a cold morning and defendant replied that he had just returned from the desert. Torgersen spoke with the supervising criminalist at the San Diego Police Department crime laboratory and was told that DNA technology could obtain DNA evidence and blood from items that have been dry cleaned or laundered. Judge Bashant issued the warrant.

### 5. *The fifth warrant*

On February 13, 2002, Detective James Hergenroeather applied for a fifth and final warrant for a more extensive search for evidence, including trace evidence, located in defendant's home. Hergenroeather incorporated the affidavits from the previous warrants in support of his request, as well as the child pornography found in defendant's home. He also indicated that a strand of blond hair microscopically similar to Danielle's hair had been found in defendant's 4Runner. Judge Bashant issued the warrant.

### b. *Analysis*

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures" and requires search warrants to be issued only upon a showing of "probable cause" describing with particularity "the place to be searched, and the . . . things to be seized." (U.S. Const., 4th Amend.)

The pertinent rules governing a Fourth Amendment challenge to the validity of a search warrant, and the search conducted pursuant to it, are well-settled. "The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040 (*Kraft*), citing *Illinois v. Gates* (1983) 462 U.S. 213, 238-239.) "The test for probable cause is not reducible to 'precise definition or quantification.' " (*Florida v. Harris* (2013) 568 U.S. 237, 243 [133 S.Ct. 1050, 1055].) But we have stated that it is " 'less than a preponderance of the evidence or even a prima facie case.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 370.) " 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*Kraft, supra*, at pp. 1040-1041, quoting *Illinois v. Gates, supra*, at p. 238.) "The magistrate's determination of probable cause is entitled to deferential review." (*Id.*, at p. 1041; accord *People v. Carrington* (2009) 47 Cal.4th 145, 161.) We explained in *Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150, that the warrant "can be upset only if the affidavit fails as a matter of law to set forth sufficient competent evidence" supporting the finding of probable cause.

Applying these principles, we find a substantial basis for the trial court's conclusion that there was sufficient probable cause to conduct a search of defendant, his residence, and his

vehicles that would uncover evidence related to the abduction of Danielle, even without considering the polygraph evidence.

As explained in sworn testimony used to support the application for the first search warrant, Detective Alldredge had information suggesting defendant may have lied about retrieving his motorhome from storage on the morning after Danielle's abduction. A neighbor had seen it parked in the neighborhood the previous night. Regardless, it appeared that defendant left in a hurried manner the next morning, and then did not return to his home for two days. When defendant did return and was contacted by officers, he displayed an unusual amount of cooperativeness — a distinct trait associated with abductors, according to FBI profilers. In addition, defendant matched other characteristics identified by the profilers as typical of abductors. When the search and rescue dog displayed an interest in defendant's garage, defendant provided a convenient explanation that was inconsistent with the information Brenda had provided the officers concerning her children's visit to defendant's house. In his interview with Detective Keene, defendant related information concerning Danielle (the upcoming school dance, her new blouse, her father's concern that she was growing up too fast) that, according to Brenda, only Danielle, her family, and one other neighbor would have known. These circumstances, at least as understood at the time of the execution of the first search warrant, led to the reasonable inference that defendant had learned of the planned father-daughter dance from Danielle

herself.[5]  Moreover, defendant oddly voiced "out of the blue" surprise that Brenda's children were being watched not by a babysitter, but by her husband, on the night of the abduction.

Defendant's description of his weekend contributed further to suspicion about him and his version of events. Defendant first drove his motorhome to Silver Strand where he overpaid to camp for several nights, despite claiming he did not have his wallet with him.  All of the blinds on the motorhome were closed, and the park ranger who sought to return defendant's overpayment to him described defendant's conduct as suspicious.  Although he had paid for several nights, defendant left the campsite soon after being contacted by the park ranger.  More important, after describing how he dug his motorhome out of the sand, defendant said "*we* drove back to Silver Strand," suggesting he was not alone during the trip. Moreover, defendant stayed only briefly at Silver Strand and returned home relatively early on the morning of February 4.

Considering the totality of these circumstances, and without consideration of defendant's polygraph examination, there was sufficient probable cause to issue the first search warrant because there existed a "fair probability" that the search of his home, vehicle, and motorhome would reveal evidence of a crime.  (*Kraft, supra*, 23 Cal.4th at p. 1040.)

As for the subsequent warrants, each one was based on additional, potentially incriminating evidence discovered via

---

[5]    After the execution of the first warrant, Alldredge learned from Brenda that she might have discussed the father-daughter dance in defendant's presence.

either a prior warrant or based on other additional information learned during the continuing investigation.

Concerning the second warrant, the execution of the first warrant had led to the discovery of possible child pornography stored on CD's. According to the FBI profilers, most abductions of children ages five and above are for sexual purposes, and the CD's suggested that defendant had a sexual interest in children. This discovery, in addition to the evidence asserted in the prior warrant that was not related to the polygraph examination, provided a "substantial basis" to believe that there was a "fair probability" that additional incriminating evidence might be stored in defendant's computer and other electronic media. (*Kraft*, *supra*, 23 Cal.4th at p. 1040.)

The discovery of possible child pornography from the first and second warrants, in addition to the non-polygraph-related facts demonstrating probable cause from the first warrant, justified the issuance of the third warrant. The evidence obtained from the execution of the prior warrants demonstrated defendant's possible sexual interest in children. The first warrant affidavit described defendant's inconsistent statements regarding his whereabouts on the night of Danielle's disappearance and his odd behavior with the park ranger at the Silver Strand camping spot. These circumstances provided a "substantial basis" upon which to believe that there was a "fair probability" that a search of defendant's cell phone records, including his location, would reveal that he had not been truthful to investigators concerning his activities during the weekend in question. (*Kraft*, *supra*, 23 Cal.4th at p. 1040.)

Regarding the fourth warrant to seize and search the clothing and bedding defendant had taken to the dry cleaners,

the supporting affidavit incorporated the facts asserted in the prior three search warrant affidavits. In addition, the fourth search warrant affidavit also alleged that two dry cleaning receipts had been found during the search of one of defendant's vehicles and that defendant had admitted he had dropped off items at the cleaners on the weekend in question. The affidavit also alleged that the employees at the dry cleaner's had noted that defendant had presented his items at an unusual time and was wearing clothing inconsistent with the cold weather that morning. Specifically, he wore no jacket, yet turned in a jacket for dry cleaning. Moreover, the affidavit alleged that DNA evidence could still be obtained from items that had been dry cleaned. Placing aside the polygraph evidence alleged in the first warrant, these additional facts, in conjunction with those previously alleged in the prior affidavits, provided a "substantial basis" on which to believe there was a "fair probability" that a search of defendant's clothing and bedding would uncover evidence relevant to Danielle's disappearance. (*Kraft*, *supra*, 23 Cal.4th at p. 1040.)

Concerning the fifth and final warrant for a more extensive search for evidence, including trace evidence, located in defendant's home, the supporting affidavit incorporated the facts asserted in the prior search warrant affidavits. The affidavit also described the discovery, in defendant's 4Runner, of a strand of blond hair that was microscopically similar to Danielle's hair. Without consideration of the polygraph evidence alleged in the first warrant, this fact, in conjunction with those facts previously alleged in the prior affidavits, provided a "substantial basis" on which to believe there was a "fair probability" that a trace evidence search of defendant's

home would uncover additional evidence relevant to Danielle's disappearance. (*Kraft, supra,* 23 Cal.4th at p. 1040.)

Given the above conclusions, we need not reach whether the first search was justified by the good faith reliance of the police on the magistrate's issuance of the warrant or whether substantial evidence supported the trial court's conclusion that defendant's voluntary consent provided an alternative basis for the first search.

### 2. *Denial of Defendant's Challenges for Cause*

Defendant contends the trial court improperly denied his challenge for cause concerning Prospective Juror number 19. He claims prejudice from the fact that he was forced to use a peremptory challenge to remove Prospective Juror number 19, leaving him with no remaining peremptory challenges to use on two allegedly biased prospective jurors — Prospective Juror number 34, who became seated Juror number 4, and Prospective Juror number 51, who became seated Juror number 2. Although we conclude that defendant adequately preserved this issue for appeal, we find no error in the trial court's denial of defendant's challenge for cause to Prospective Juror number 19. In any event, defendant fails to show that the court's denial resulted in him being tried by a biased juror. In addition, to the extent that defendant further contends or suggests that other jurors should have also been removed for cause, we also reject those arguments.

### a. *Background*

Prospective Juror number 19 was a 58-year-old elementary school principal who lived in Poway. She indicated on her jury questionnaire that she had "a positive attitude toward law enforcement officers," whom she often dealt with in

connection with her work. However, she indicated that her attitudes concerning the criminal justice system would not influence her in favor of either the prosecution or the defense regardless of the evidence. She believed that she was a good judge of a person's credibility. She explained that she dealt with all types of people in her work and often had to make judgments about a person's character. She felt that she could be an impartial juror because she "practice[d] this with children in discipline situations." She stated that she was "pleased to serve [as a juror], but . . . very uneasy about her work responsibilities." She indicated on her jury questionnaire that "[i]t would be extremely difficult to be away from [her] school (work) for the length of time this case requires."

In response to the questionnaire inquiry regarding whether she "[w]ould like to be a juror in this case," Prospective Juror number 19 checked "no," and stated: "I cannot serve on a case where the victim was a child." She believed that her objectivity might be "colored," although she continued to consider herself fair. When asked on the questionnaire about her ability to view photographs of the victim's decomposed body, Prospective Juror number 19 indicated this would affect her ability to be fair and impartial because "[c]hildren have been [her] life for 37 years." Prospective Juror number 19 indicated that she had basic background information about the case from the news and had formed opinions based on that information that the parents were guilty of neglecting their responsibilities and that defendant had acted strangely by driving to the beach and then the desert. When asked whether she could set aside her opinions and decide the case based on the evidence presented in court, Prospective Juror number 19 checked the box indicating "yes." When asked whether, despite anything she

had seen, heard, or read, she could be fair to both sides, she again checked the box indicating "yes." She indicated she would not automatically choose either death or life in prison, but would consider all of the evidence in determining the appropriate penalty. However, when asked at the end of the questionnaire whether she was willing to serve as a juror on this case, Prospective Juror number 19 answered "no," because she could not "fulfill her obligations to her staff and students if [she was] away from school for 12 weeks." Again, she stated that there was no reason she would not be a fair juror in this case.

When Prospective Juror number 19 appeared in court for oral voir dire, she reiterated to defense counsel her questionnaire responses that she could not serve on a case involving a child victim, that this might color her objectivity, and that she could not be fair and impartial because children had been her life for 37 years. When asked whether she was saying that she could not be fair and impartial in this particular case because it involved an allegation of murder of a child, she stated that it "would color [her] feelings." Defense counsel noted that she used the word "color" in her response, but in her questionnaire she used words like "I cannot serve." He asked her to explain. Prospective Juror number 19 responded that she had spent "a great deal of [her] life protecting children. [She had] gone to the authorities about abuse for children. The rights of children are uppermost in [her] mind and [she would have] a hard time looking at a defendant in a child — a case where a child has been a victim." She confirmed that sitting as a juror on the case would create a professional hardship for her.

In response to voir dire by the prosecution, Prospective Juror number 19 confirmed that she had to be fair and impartial in her type of work and that she was fair even when the children

were not her "favorites." When asked if she could be fair and impartial in this case, she said that she could not answer that question because she did not know if she could be fair and impartial. The prosecutor then asked: "If you were told that you had to make your decisions based upon the evidence that came forward in this case and only that evidence, could you do that?" Prospective Juror number 19 answered, "yes." Asked if she would "let us know" if she found that she could not, Prospective Juror number 19 said, "yes."

The following colloquy then occurred between the court and Prospective Juror number 19:

[THE COURT]: "Juror 19, you're sort of a rare breed. In reading your questionnaire you're obviously very educated and so forth, but you give what I will describe, as a judge, conflicting messages.

"Counsel have each asked you questions from their perspective, and I'm going to ask you point blank and direct.

"Knowing everything that you know about yourself, and what you've seen and heard to this point in this case, do you believe that you can be fair and impartial to both sides in this case?"

[PROSPECTIVE JUROR NO. 19]: "I honestly believe that I am fair and impartial in this particular case. I'm not sure that my beliefs wouldn't color the case."

[THE COURT]: "Okay."

[PROSPECTIVE JUROR NO. 19]: "I don't know what else to tell you.

[THE COURT]: "And I appreciate that. You're just not sure?"

[PROSPECTIVE JUROR NO. 19]: "Yeah."

The defense challenged Prospective Juror number 19 for cause, additionally pointing to her questionnaire response that her fairness and impartiality would be affected by viewing photographs of the victim's body. The trial court responded: "Well, I understand that, but the reason I ask[ed] the question [was] because my own notes show what a dilemma she is. Because of her experience and her training, she has made it quite clear that she's very objective and she's a very fair individual. The answers she's given do not indicate an extreme bias or prejudice that would prohibit her from doing her job. I'll note a challenge to nineteen and it will be denied."

### b. Discussion

" 'As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the jury as presently constituted.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1239, quoting *People v. Mills* (2010) 48 Cal.4th 158, 186; accord *People v. Avila* (2006) 38 Cal.4th 491, 539.)

The People contend defendant failed to satisfy the third requirement and thus, forfeited the issue on appeal. It is undisputed that defendant exercised a peremptory challenge as to Prospective Juror number 19. And defendant moved for

additional peremptory challenges after he had exhausted his 20 peremptory challenges. The defense based its request on "the challenges for cause that were denied," and identified in particular Prospective Juror number 19. Defense counsel took the position that the defense was "entitled to an additional challenge for her and also the other challenges for cause that were made and denied." The trial court denied the request and the jury was sworn. The following day, the defense recognized that it had "failed to make clear" that the reason it requested additional peremptory challenges the previous day "was that we were dissatisfied with the panel as it was presently constituted and that if we had had those peremptory challenges, we would be challenging Jurors 2, 4, 6, . . . 11 and 12." As the People observe, defendant did not expressly state his dissatisfaction with the composition of the jury before the jury was sworn. Defendant contends, however, his dissatisfaction was implicit in his request for additional peremptory challenges based on the trial court's denial of defendant's challenge for cause to Prospective Juror number 19 and other prospective jurors, as he expressly clarified the next day.

In *People v. Carasi* (2008) 44 Cal.4th 1263, we found forfeiture where the defendant had exercised a peremptory challenge to remove the prospective juror in question, had exhausted all of his peremptory challenges, and had asked "for more" peremptory challenges. (*Id.*, at p. 1290.) We found that defendant had not expressed dissatisfaction with the jury as constituted. (*Ibid.*) Here, however, defendant specifically tied his request for additional peremptory challenges to the denial of his challenge for cause to Prospective Juror number 19 and "others," which could have included his denied challenges to seated Juror numbers 2 and 4. And, he specifically clarified the

next day that the defense was dissatisfied with the panel as it was presently constituted, identifying, among others, Juror numbers 2 and 4. We conclude defendant adequately stated his dissatisfaction with the jury as sworn. (*People v. Rices,* (2017) 4 Cal.4th 49, 75; see also *People v. Souza* (2012) 54 Cal.4th 90, 130.)

Although defendant preserved the issue for appeal, we reject the claim on the merits.

"We will uphold a trial court's ruling on a challenge for cause ' " ' "if it is fairly supported by the record." ' " ' [Citation.] The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses. [Citations.] Thus, ' " ' "[o]n review of a trial court's ruling, if the prospective juror's statements are equivocal or conflicting, that court's determination of the person's state of mind is binding.' " ' [Citations.]" (*People v. Clark* (2011) 52 Cal.4th. 856, 895 (*Clark*); accord *People v. Virgil, supra*, 51 Cal.4th at p. 1241; *People v. Hillhouse* (2002) 27 Cal.4th 469, 489 (*Hillhouse*) ["The trial court is present and able to observe the juror itself. It can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript"].)

Here, Prospective Juror number 19 gave equivocal and conflicting responses regarding her ability to be fair and impartial in this case. Ultimately, the trial court credited her final statement that, knowing everything that she knew about herself and considering what she had seen and heard to that point, she could be fair and impartial in this particular case. Under settled law, the trial court's determination of her state of mind is, appropriately, binding on our review.

Defendant argues, however, that Prospective Juror number 19's final statement was not an unqualified assertion. He notes that Prospective Juror number 19 also concluded with the statement that she could not be sure that her beliefs "wouldn't color the case." But Prospective Juror number 19 had previously explained what she meant by the word "color" in her voir dire answers. She indicated that because of her lengthy professional background in education, the rights of children were "uppermost in [her] mind" and that she would have "a hard time looking at a defendant" in a case involving a child victim." Essentially, Prospective Juror number 19 acknowledged that because of the nature of her work, she would have a difficult emotional reaction to this case involving an alleged murder of a child. Of course, "[a]ny juror sitting in a case such as this would properly expect the issues and evidence to have an emotional impact. A juror is not to be disqualified for cause simply because the issues are emotional." (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1091 (*Bittaker*).) Nor do we expect jurors to " ' "shed their backgrounds and experiences" ' " in deliberating on a verdict. (*People v. Peoples* (2016) 62 Cal.4th 717, 777.) We find it significant that Prospective Juror number 19 repeated to counsel and the court that she could nevertheless make her decision based solely upon the evidence and would let them know "if she found that she could not." Overall, the trial court reasonably could have found that the voir dire responses of Prospective Juror number 19 reflect a thoughtful and cautious self-awareness that supports the trial court's conclusion that she could be a fair and impartial juror. (See *Hillhouse, supra*, 27 Cal.4th at p. 488.)

Arguing against such a conclusion, defendant urges us to find his challenge for cause concerning Prospective Juror

number 19 analogous to the challenge for cause to Juror Staggs in *Bittaker, supra*, 48 Cal.3d at pages 1089-1090, and Juror McAdam in *People v. Vitelle* (1923) 61 Cal.App. 695, 697-700 (*Vitelle*), both of which were found to have been erroneously denied. These cases are distinguishable from the circumstances here.

In *Bittaker*, Juror Staggs told the trial court "that she had worked at a rape crisis center, and did not believe she would be impartial in a case involving charges of rape," which Bittaker's was. (*Bittaker, supra*, 48 Cal.3d at p. 1089, fn. omitted.) "Her voir dire present[ed] no unqualified statement that she actually felt that she could be fair and impartial in the penalty phase of this case." (*Ibid.*) Indeed, she told defense counsel that she would be unable to fairly and impartially judge and evaluate the situation because of her strong feelings about victims of rape. (*Id.*, at pp. 1089-1090.) "The prosecutor attempting to rehabilitate her, could obtain only a statement that she would act impartially at the guilt phase." (*Id.*, at p. 1090.) When questioned by the trial court, she said that she could try to listen to the evidence and be a fair and impartial juror, " 'but I believe it would be difficult' " and she thought that she " 'wouldn't be listening wholly to the evidence.' " (*Ibid.*) Given that Juror Staggs did not think she could be impartial at the penalty phase, and that she might not listen to all the evidence, we concluded the trial court erred by denying the challenge for cause. (*Ibid.*) In contrast, Prospective Juror number 19 did state that she could be a fair and impartial juror, despite her qualms regarding the nature of the case. She did believe she could make a decision in the case based solely on the evidence and nothing in the record suggests she would not listen to and consider all of the evidence presented.

In *Vitelle*, counsel for each side knew that the evidence would show that the defendant was a member of the Ku Klux Klan and that the charged assault was alleged to be a Klan activity. (*Vitelle, supra*, 61 Cal.App. at p. 696.) On voir dire, then Prospective Juror McAdam stated that he " 'was not in favor of the Klan,' " and that it would create in his mind bias and prejudice if it turned out that the defendant was a leading member of the Klan. (*Id.*, at p. 697.) Asked whether, with such bias and prejudice, he could still act fairly and impartially toward the defendant, McAdam replied that he did not think he could. (*Id.*, at pp. 697-698.) He thought that the defendant's membership in the Klan " 'would weigh with [him] to such an extent that [he] would be influenced in hearing the testimony.' " (*Id.*, at p. 698.) He admitted that the mere fact that the defendant was a Klan member would bias him. (*Id.*, at p. 699.) If the evidence showed that the defendant took part in any Klan activities, McAdam said that he would have a prejudice against the defendant. (*Ibid.*) Although McAdam also stated his willingness to accept the court's instructions, to attempt to decide the case in accordance with the law, and to give the defendant the legal presumption of innocence until the complete establishment of his guilt (*id.,* at pp. 698-699), the reviewing court found error in the trial court's denial of a defense challenge for cause to McAdam. According to the appellate court, there was "no escape from the conclusion that there existed in the mind of McAdam a state of mind in reference to the case which necessarily prevented him from acting with entire impartiality and without prejudice." (*Id.*, at p. 700.) Here, Prospective Juror number 19 affirmatively stated that she could be fair and impartial. The trial court, which questioned her and observed

her voir dire responses, believed her.  We will not overturn its credibility call.

We find no error in the trial court's denial of defendant's challenge for cause to Prospective Juror number 19.

### c. Prejudice

Moreover, even assuming error concerning Prospective Juror number 19, we also reject defendant's related claim of prejudice or any suggestion that the trial court incorrectly denied defendant's other challenges for cause.  Specifically, defendant fails to show that the trial court's ruling improperly forced him to be judged by Juror numbers 2 and 4, both of whom defendant suggests should have been removed for cause.  (See *People v. Black* (2014) 58 Cal.4th 912, 920.)

Defense counsel challenged Juror number 2 for cause on the ground that Juror number 2 had expressed his belief in "a life for a life," and would reach an automatic death verdict if defendant were found guilty.

The prospective juror who became Juror number 2 wrote that he strongly supported the death penalty, and that his views regarding it were "a life for a life."  But he wrote he did not hold his belief in favor of the death penalty so strongly that he would be unable to impose life without possibility of parole regardless of the facts.  He also indicated that his opinion in favor of the death penalty would not "substantially impair" his ability to perform as a juror such that he would vote only for the death penalty.  He acknowledged his willingness to weigh and consider all the evidence of aggravating and mitigating factors before deciding the appropriate punishment.  He indicated that he would not automatically vote for a verdict of death in a case involving these charges and special circumstances, but instead

would listen and consider all of the evidence at the penalty phase before reaching a decision.

During voir dire, Juror number 2, consistent with his questionnaire, affirmed he would not automatically impose the death penalty if the trial reached a penalty phase. Juror number 2 further explained that he would "have to hear all the evidence" but would have a hard time imposing the death penalty based on circumstantial evidence. He stated that if the matter reached the penalty phase that he could not "say right now which way [he] would go." However, when asked to assume that defendant had already been found guilty beyond a reasonable doubt, he affirmed his belief of a life for a life, explaining that his belief is "pretty strong," because he thought that "a life is precious." Yet on further questioning by the prosecutor about considering evidence presented at the penalty phase, Juror number 2 reverted to his prior answers and stated he would first listen to the evidence, including mitigating evidence, before reaching a decision.

The trial court denied the defense challenge for cause of the prospective juror who eventually became Juror number 2. The court indicated that Juror number 2's questionnaire was clear and unequivocal that he could be fair and impartial. And the court did not "believe that one question couched in such a way as to change the ground rules . . . is going to make him have cause to create an inability not to follow the law."

With one exception, Juror number 2's questionnaire and voir dire answers were clear that, despite his views in favor of the death penalty, he would first consider the penalty phase evidence and not automatically vote for death. On a single question during voir dire, defense counsel elicited one conflicting

response, by asking him to assume that defendant was guilty beyond a reasonable doubt, but outside the context of considering aggravating and mitigating evidence presented at a penalty phase. Juror number 2 subsequently made clear that he would consider evidence presented during the penalty phase before deciding punishment. In that sense, the trial court reasonably determined that the one conflicting response elicited by the defense through a leading question did not represent Juror number 2's true state of mind and properly denied the defense challenge for cause. We must defer to that determination because it is supported by substantial evidence in the record.

Defense counsel challenged Juror number 4 for cause on the ground that Juror number 4 had been intimidated by the court into saying that she could be fair and impartial when in fact she was biased.

The prospective juror who became Juror number 4 identified herself as being from Germany and asserted that English was her second language. She stated nothing in her questionnaire or during her first voir dire that disqualified her. She had initially been passed for cause by both sides.

But after the court denied her hardship request, Juror number 4 wrote a note to the court explaining that she had misunderstood one of the questions on the form, specifically the question asking whether she had friends or relatives in law enforcement. She thought the question applied to only police officers, but she now wanted to disclose that she had a close personal friend who was a retired deputy district attorney. She explained that they had discussed the criminal justice system,

and as a result, she had formed opinions "favorable towards prosecutors."

Because of her note, Juror number 4 was called into court for further voir dire. Defense counsel asked Juror number 4 whether her personal friendships would result in her favoring the prosecution such that she could "no longer be completely, one-hundred percent objective." Juror number 4 responded affirmatively. Defense counsel then asked: "So as a result of your acquaintance with the prosecutors, in your view, you have a bias such that it would prevent you from being a fair juror in this case?" Juror number 4 responded, "I would think so, yes."

The court asked Juror number 4, who had previously said she could be fair to both sides, why she had changed her mind. Juror number 4 explained that she had seen her friend the prior night and that he had advised her to disclose the existence of their friendship. She further explained that she was "not familiar with the justice system the way everybody else seems to be." Because her answer was not directly responsive to the court's question, the court again asked Juror number 4 whether she was trying to tell the court that she could not be fair, and she responded: "I'm not a hundred percent sure. But it seems like I have to explain this to you that I have this connection, and we have talked about the judicial system. So that's all I'm trying to say here."

On further questioning by the prosecutor, Juror number 4 stated that her friend, the retired prosecutor, had advised her to inform the court of their friendship to the court, because she would perjure herself if she did not disclose it. The prosecutor also asked Juror number 4 whether she could be fair, and she replied: "Yes. I think I can be fair, but the thing is I don't — I

did not tell you about this gentleman because I wasn't aware that this is required of me."

The court then interrupted and explained its concern about why she had told defense counsel that she could not be fair and then told the prosecutor she could be fair, and asked: "Now, what is it, Ma'am? Can you be fair and objective to both sides or not?" She replied: "I don't see why I can't be, but I am thoroughly confused at this point." Juror number 4 affirmed again that she did not know of any reason why she could not be fair and impartial.

In contending that Juror number 4 should be dismissed for cause, defense counsel acknowledged that her statements about fairness were unequivocal but was critical of "the court's tone of voice" in questioning her and contended that she might have been intimidated. Defense counsel also questioned whether Juror number 4 had difficulty understanding because English was not her first language. The prosecutor responded that Juror number 4 told him without any pressure that she could be fair. The trial court found no basis for disqualification and denied the challenge.

Defendant claims on appeal that Juror number 4 was influenced and intimidated by the court into saying that she could be fair and impartial when in fact she was biased. But viewing the totality of her expressed concerns, it appears that Juror number 4 was merely attempting to state that her friendship with the retired prosecutor caused her to doubt whether she could be "a hundred percent" objective, but that she still believed she could be fair. In assessing whether a claim of juror misconduct indicates juror bias requiring reversal of the judgment, we have acknowledged that "[j]urors are not

automatons" but are "imbued with human frailties as well as virtues" and that our system cannot survive by demanding "theoretical perfection from every juror" and that we "must tolerate a certain amount of imperfection short of actual bias." (*In re Carpenter* (1995) 9 Cal.4th 634, 654-655.)

Here, Juror number 4, in an abundance of caution, alerted the court and the parties to something she had overlooked. She acknowledged that it did not make her objectivity 100 percent perfect but repeatedly clarified that she thought she could still be fair overall. The trial court acted within its discretion in denying the defense challenge for cause of Juror number 4.

As a result, defendant fails to show that the court erred in denying his challenges for cause of the prospective jurors who became seated as Juror numbers 2 and 4. Therefore, even assuming the court erred in not removing Prospective Juror number 19 for cause, defendant fails to show prejudice.

### 3. Denial of Defendant's Motion for Additional Peremptory Challenges

### a. Background

On the day jury selection began, the defense noted that a large number of those who were summoned for that day had failed to appear. The defense moved the court "to do what it [could] to enforce" the summons to ensure that defendant obtained a fair and representative cross-section of the community and a jury of his peers. Believing that 80 percent of those summoned had failed to appear, the defense requested a proportionate number of additional peremptory challenges "as a remedy." The trial court denied the request.

After the defense exhausted its 20 peremptory challenges during jury selection, the defense again moved for additional

peremptory challenges. The defense based its request on "the challenges for cause that were denied," particularly with regard to Prospective Juror Number 19. The trial court denied the request and the jury was sworn. The following day, the defense told the court that what it meant the previous day was that it was dissatisfied with the composition of the jury — specifically Juror Numbers 2, 4, 6, 11, and 12 — and that this had been the reason for requesting additional peremptory challenges. The trial court found the request untimely because the panel had already been sworn, but noted that it would have denied the request even if it had been made before the panel was sworn.

### b. *Discussion*

Defendant contends on appeal that the trial court erred in denying his requests for additional peremptory challenges, resulting in a violation of his constitutional right to due process. He argues that the extensive pretrial publicity surrounding his case required that he be granted the requested additional peremptory challenges to ensure a fair and impartial jury. (See *People v. Bonin* (1988) 46 Cal.3d 659, 679 (*Bonin*).) The People respond that defendant forfeited his claim by failing to raise this ground as a basis for his requests. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 946.) In turn, defendant claims the trial court and parties were acutely aware of the problem of pretrial publicity and, thus, the court would have fairly understood that defendant's request for additional peremptory challenges was ultimately based on such publicity. (*Clark*, 52 Cal.4th at p.966; *People v. Scott* (1978) 21 Cal.3d 284, 290.)

The record reflects the trial court's general concern with the media attention that defendant's case was receiving. But it does not support defendant's claim that the trial court would

have understood his request for additional peremptory challenges as being based on an effort to offset the effect of the pretrial publicity. Nothing in defendant's request to "remedy" either the failure to appear of a large percentage of those summoned for jury duty or the trial court's denial of defense challenges for cause would have alerted the court to a defense concern that the jury venire might be pervasively biased because of the media interest in and accounts of the case. We conclude defendant's failure to cite pretrial publicity as a basis for his requests for additional peremptory challenges forfeited his claim on appeal.

Even if we were to conclude otherwise, we would reject his claim on the merits.

"Peremptory challenges are intended to promote a fair and impartial jury, but they are not a right of direct constitutional magnitude." (*People v. Webster* (1991) 54 Cal.3d 411, 438, citing *Ross* v. *Oklahoma* (1988) 487 U.S. 81, 88-89.) "To establish a constitutional entitlement to additional peremptory challenges, the defendant must at least show that he is likely to receive an unfair trial before a biased jury if the request is denied." (*People v. DePriest* (2007) 42 Cal.4th 1, 23 (*DePriest*).)

Turning to such circumstances here, we note that defense counsel stated the defense needed additional peremptory challenges because of dissatisfaction with seated Juror numbers 2, 4, 6, 11, and 12. Of those five, the defense challenged for cause only Juror numbers 2 and 4. As we have explained above, because the trial court properly denied these challenges, defendant fails to show that he was tried by a juror who would have been removed if defendant had been granted additional peremptory challenges. Therefore, this was not a scenario in

which "an erroneous denial of a challenge for cause can be cured by giving the defendant an additional peremptory challenge." (*Bittaker*, *supra*, 48 Cal.3d at p. 1088.)

We also reject defendant's assertion that the pretrial publicity resulted in him being tried by a biased jury. As we will explain, none of the seated jurors expressed biased created by pretrial publicity. Moreover, the trial court took numerous steps to protect the jurors from the public awareness and interest in the case.

Juror number 1 indicated that she had not "followed the case closely" and did not know "much" about it. She averred under penalty of perjury that she had formed no opinion, and would be able to decide the case exclusively on the evidence presented at trial even if it conflicted with what she had previously heard.

Similarly, Juror numbers 2, 3, 4, 9, and 11, as well as alternate Juror numbers 13, 15, 16, and 18, declared that they did not know much about the case, had formed no opinion about it, and could decide the case based solely on the trial evidence.

The jurors who had been exposed to more of the media coverage of the case also dispelled any belief that they had been biased. Juror number 5 indicated she knew "very little" about the case, and the opinion she formed was that she was not inclined to believe what the media or others had said. Juror number 6 knew "some" details of the case and had formed the opinion that there was enough evidence to arrest defendant and that the authorities were being careful because it was a highly publicized matter, but declared the ability to decide the case exclusively on the trial evidence. The responses of alternate Juror numbers 14 and 17 were similar. Juror number 7 knew

that a child had disappeared from her room and that her body had been discovered some weeks later. She had formed no opinion from the publicity and averred that she could base her decision entirely on the evidence presented at trial. Juror number 8 had similar knowledge of the case and thought that defendant "could possibly be guilty," but declared that she could set aside any opinion she had formed and base her decision "on [the] evidence fairly." Juror number 10 knew the "basic facts" of the case, but had formed no opinion and could decide the case based solely on the trial evidence.

Lastly, Juror number 12 stated he did not believe that he knew anything about the case, despite the media coverage. He had formed no opinion and could decide the case on the evidence.

We find no reason to disregard these assurances, by the prospective jurors who were eventually seated, that they could set aside whatever they learned from the media and decide the matter based entirely on the evidence presented at trial. (*Prince, supra*, 40 Cal.4th at p. 1215.)

Finally, we note that the trial court took numerous precautions to prevent infection of the jury pool with prejudicial information and to ensure a fair trial. Although the search warrants themselves were made public, the trial court ordered the attached affidavits and exhibits sealed. A gag order was issued against the attorneys and law enforcement officers involved in the case. Pretrial hearings concerning the admissibility of evidence were closed to the public and media. The trial court ordered that voir dire, although open to the public, was not to be filmed. No one entering the courthouse was to be photographed on the day the prospective jurors were to report, and no names were to be utilized in the selection

process. The trial court took the unusual step of directing the jury commissioner to inform the prospective jurors appearing for defendant's case that they were not to discuss "anything about what they might think they were there for." As soon as the prospective jurors appeared in the courtroom, the trial court emphasized that the trial was to be based solely on evidence presented in the courtroom and not by any information from media sources. The jurors were told that the media had been instructed to have no contact with them and that they were not to read, listen to, or watch any programs or news items that related to the case. Our review of the record persuades us that the proceedings were conducted with solemnity and sobriety.

Defendant, therefore, has not met his burden to show that he was likely to receive an unfair trial because of asserted bias based on pretrial publicity. (*DePriest, supra*, 42 Cal.4th at pp. 23-24.) If defendant had properly preserved this issue for appeal, we would find no error in the trial court's denial of his requests for additional peremptory challenges.

### 4. The Trial Court's Alleged Failure to Sequester the Jury

Defendant contends the publicity and public sentiment surrounding his case was so extreme as the trial progressed that it was not only an abuse of discretion under section 1121 for the trial court to have declined on multiple occasions to sequester the jury, but also, under a de novo standard of review, it amounted to a violation of his constitutional right to due process. Defendant argues that the trial court, in fact, did not even truly exercise its discretion, but improperly left the decision on sequestration up to the jury. We disagree with defendant's characterization and find no error.

### a. Background

Prior to trial, the defense filed a motion to sequester the jury for the entire trial in lieu of a motion for change of venue. Pointing to the extensive publicity the case was receiving, the defense contended that sequestering the jury was necessary in order to ensure that it was free from outside influences and to guarantee defendant a trial by an impartial jury. The defense noted that such publicity had been the basis for the trial court's order sealing pretrial motions and its gag order. The court deferred a ruling on the motion.

In its initial charge to the jury, the court raised the subject of the media's coverage of the case. It told the jurors that "there is a lot of misinformation that is out on the media regarding this trial" and if they listened to and used such misinformation, it would do "a grave disservice to both sides in this case." The trial court reminded the jurors that they had been selected because they had agreed to base their decisions solely on the evidence presented. It then told them that it had many options "in terms of handling the media," but it had selected "self-polic[ing]" as the best option for the jurors and the trial. The court directed the jurors to "not look at anything that has anything to do with this case, whether it be print, radio, or television media." If problems came up, the court promised it would address them.

And indeed, some problems arose. When the trial court noticed that a number of individuals in the courtroom audience were wearing buttons containing a picture of Danielle, the court told the audience that such buttons, placards, and T-shirts were unacceptable and not allowed. The court warned all those present that it would not allow the jury to be intimidated. When it later came to the court's attention that members of the public

were still wearing the buttons in the courthouse hallway, it reminded the jury that this had nothing to do with the lawyers, the evidence before them, or the jury's job. It was "just one more form of the kinds of publicity or bias that [the jury had] been selected to overcome."

As television reporting continued, the trial court specifically admonished the jury to avoid the coverage "at all costs," unplugging their television if necessary. The court advised the jury to stay out of internet chat rooms and avoid any internet coverage of the case. The court frequently repeated its admonishments.

At one point, the trial court was advised that the county probate office had received a number of phone calls after a newspaper had published the occupations of the jurors. Juror number 7 was one of only seven probate examiners in the office, so it would not be difficult to ascertain her identity in light of her altered work schedule. The court made arrangements with the probate office to avoid pressure on Juror number 7 from coworkers or the public.

Defendant's renewed motion for sequestration was denied without prejudice to the issue being raised again and reevaluated as circumstances warranted.

Subsequently, the jury sent the trial court a note indicating that it believed Brenda Van Dam was "glaring or staring" at them. The court addressed the matter in closed session. The court asked the jurors to raise a hand if they felt they were being intimidated in any way by the Van Dams. No juror did so. When the court inquired whether any juror felt Brenda's presence in the courtroom would in any way affect his or her ability to be fair and impartial to both parties, no juror

indicated that it would. The court told the jury that it should notify the court if at any time the conduct of the Van Dams or anyone else in the courtroom started to affect their ability to listen to the testimony and be fair and impartial. The court later repeated that any juror was welcome to raise any concern that arose regarding perceived interference or intimidation. When Damon Van Dam was subsequently expelled from the courtroom for glaring at defendant, the jurors were admonished that the court had made rulings that might or might not be reported in the press. The court reemphasized that the jurors must be vigilant in their self-policing.

The defense renewed its motion for jury sequestration three days later, in light of further media attention, most significantly false reports of the number of child pornography images recovered from defendant's computers. The trial court responded that it would not sequester the jury because the court had no reason to believe that the jurors were disregarding the court's order to pay no attention to the publicity.

Due to weekends, court holidays, and the trial court's pre-planned vacation, the jury was to be excused for 11 days from Wednesday July 10 until Monday July 22, 2002. Before the jurors were excused, the trial court again reminded them that they must "guard against, in the utmost way possible, reading or listening to" media coverage of the case. The court suspected that "all of the talking heads" would try to keep interest in the case going until the trial started up again and it was "very, very important" that they continue to "self-police."

When the trial resumed on July 22, the defense made a motion for mistrial based on the "tremendous amount of publicity" concerning the case. The defense took the position

that the media coverage was "inescapable and at least some jurors must have . . . been exposed to something in this case." This, according to the defense, was compounded by news stories about another case in which a five-year-old girl, Samantha Runnion, was kidnapped and sexually molested. Noting the denial of its requests for sequestration, defendant requested a mistrial. The prosecution opposed the motion, which it characterized as being based on speculation. The trial court denied the motion. It explained that the media coverage was no different from what had been occurring throughout the trial and that it intended to discuss with the jury its duty to ignore the media focus on the Runnion case. Importantly, it noted that there was "no evidence that any media coverage is being viewed by these jurors, and [it had] every reason to believe they [were] abiding by the court's orders."

On July 27, the court conducted a closed session to discuss with the parties an incident that had been reported the prior evening. When Juror number 2 was walking out of the courthouse with two other jurors, Juror number 17 and Juror number 18, Juror number 2 noticed someone following them. Juror number 2, who was not wearing his juror badge at this point, fell back and watched as a man, dressed in a blue shirt and gray trousers, followed the other two jurors into the trolley station. The man got onto the trolley with the three jurors and exited at the "Old Town" station with them. The two jurors proceeded to their cars, still followed by the same man, who was keeping his distance. The man took out a piece of paper and pencil, and wrote something down as the two jurors got into their cars. Juror number 2 called the contact number he had been given for the court to report the incident. There was no indication who the person was that was following the jurors, but

the court surmised that it was likely someone affiliated with the media.

Brought in and questioned by the court, Juror number 2 confirmed these observations and added that as the jurors were driving away, the man ducked and attempted to hide. Juror number 2 indicated that Juror number 17 was aware of the incident, but he did not believe Juror number 18 was. Asked if anything about this experience would in any way affect his ability to be fair and impartial to both sides in this case, Juror number 2 replied, "No." The court questioned Juror number 17 and received a similar account of the incident. When asked whether he felt intimidated by the occurrence, Juror number 17 thought he was "fine with it . . . not happy with it, but . . . fine with it." The court also questioned Juror number 18, who said she was not aware of the person that the other jurors believed was following them. She indicated that the incident would not affect her ability to be fair or elevate her safety concerns.

The court then addressed the entire jury, informing it that some jurors may have been followed to their cars the previous evening. The court indicated it was providing this information not in an effort to make them paranoid, but to encourage them to report any such behavior. The court assured the jurors that law enforcement was investigating the incident. It also informed them that motions to sequester the jury had been made. But, the court said, it had decided that sequestration was not appropriate. Nevertheless, all security options were being considered and sequestration was a future possibility. The court encouraged any juror who believed that this incident would have a negative impact on his or her ability to be fair and impartial, or on his or her ability to act as a juror, to communicate with the court by written note. The trial court received no such notes.

On July 29, defense counsel brought to the court's attention that a show had been earlier aired on cable television titled "Body Farm," which dealt with the science of decomposition. Forensic entomologist Haskell had mentioned the Body Farm as a research facility at the University of Tennessee during his testimony. Additionally, defense counsel noted that media coverage of the Runnion case had increased, including coverage of the fact that the defendant in that case had been previously acquitted of an earlier crime. The defense was concerned that the jury here would think that if it acquitted defendant in this case, he would kill another little girl. The defense renewed its request for sequestration. The trial court responded that, as it had mentioned with regard to the problem of the jurors being followed, it would continue to consider jury sequestration as a potential option, but its preference was against it. The court explained that the jurors appeared to be a hardy group, "they don't appear to be intimidated by what occurred and I continue to believe in their integrity." The court denied the defense motion.

When the jurors returned the following day, the trial court told them that despite its understanding that all of the jurors were in complete compliance, there was still a potential for sequestering. The court acknowledged that a number of jurors had shared a concern about not being available to their families, and assured the jurors that it would take such concerns into account. It advised the jurors that it was the court's responsibility to make such decision and although the decision had not yet been made, it was the court's current plan to allow the jury to continue without sequestration. The trial court went on to recognize that the Runnion case had been recently receiving publicity and that it might appear to some to be

similar to this case. The court told the jury it was not similar and it had no bearing on the issues the jury was to decide in this case. The court also warned the jury about the "Body Farm," advising it not to watch the show. It reminded the jurors that the only scientific evidence they were to consider about decomposition had been provided by the experts who testified in court.

Prior to closing arguments, the trial court noted that defense counsel had again raised the issue of sequestration. The court informed counsel that it did not intend to sequester the jury based on its understanding of the feelings of the jurors and everything that it had observed. The court was confident that the jury could still do its job and abide by the court's orders.

Defense counsel subsequently brought to the court's attention a newspaper article that contained leaked information regarding defendant's case. The court stated that it was aware of the article and intended to follow up with law enforcement regarding the source of the leak. Defense counsel observed that another newspaper article had been published over the weekend, which specifically addressed CALJIC Nos. 2.60 and 2.61 and criticized the concept of a defendant's right not to testify. In addition, there was an article in San Diego Magazine discussing the Van Dams and the bar called Dad's. The defense asked the court to "either sequester or specifically direct the jury that there's more landmines out there." The court indicated that these were the same kinds of materials that had been covered by his previous admonitions. It denied the renewed request for sequestration, explaining that by allowing the jurors to separate and not be sequestered, it was expecting them to abide by the court's orders. For the record, the court noted again its impression from dealing with the incident in which jurors had

been followed that these jurors were "a hardy group of people," who did not "want their lives disrupted" by sequestration. It observed that sequestration also had its "own pitfalls." In later admonishing the jury to avoid media coverage, the court again emphasized that "in order for the court to abide by its commitment to you not to sequester you," it was relying on the jurors "self-policing." It told the jury that "[i]f that changes for any reason, I'm going to have to change my position."

In the course of closing argument, the court received a note from Juror number 12 indicating that the increased media coverage of the case was making it hard to have "a clear mind" because people around him were talking and interested in the case. The court addressed the issue with the entire panel, telling the jurors that they "have to figure out ways to avoid personally becoming involved" in such conversations and they must disregard anything they accidentally overhear in light of their obligation to base their decision solely on the evidence. The court advised them that to avoid sequestration, they must continue to abide by the court's order requiring self-policing. The court expressed its faith in them.

The court essentially repeated these comments in its concluding instruction to the jury. The court also instructed the jurors that it expected them to alert the court if they discovered that they could not deliberate without outside influences and wished to be isolated for deliberations.

Later the same day, the court received a note from the jury indicating that one of the jurors was being "harassed" at work to the point that he would rather be sequestered than go to work on Fridays when the court was not in session. Because sequestering would significantly affect the other jurors, the

remainder of the jury proposed that they be allowed to deliberate all or part of the day on Fridays, so that the other juror could avoid going to work. In closed session with the entire panel, the court worked out a plan that allowed them to come in on Fridays. They could convene for a short time and then leave, which would generally be sufficient to excuse them from work.

The court then separately questioned Juror number 12, who was the juror who felt harassed at work. He confirmed that the court's plan for brief attendance on Fridays would excuse him from work. Asked to describe what kind of things were occurring at work that caused him concern, Juror number 12 related that nothing had been said to him, but everyone at work had a radio and read the paper. It was becoming hard for him to go to work because "a lot of people [were not] as respectful as they should be." Juror number 12 stated that this was not influencing the way he looked at the evidence "or anything like that," but it was getting to the point that he was avoiding his work and getting "written up for it." He did not feel he should be placed in such a position. Juror number 12 stated that his concern was not with the media coverage, which he was strong enough to keep away from, but with the people at work who were making it hard for him. The new scheduling, he confirmed, would solve the problem. Asked whether any information he had received from his workplace affected his ability to be fair and objective, Juror number 12 responded: "Oh, no. None." Meeting again with the entire panel in closed session, the trial court confirmed that the majority would prefer not to be sequestered.

On August 13, the trial court held another closed session to discuss information received by the defense that reported Juror number 12 had stated to a coworker that "he wasn't going

to believe anything [one of the defense counsel] said because he didn't like him." The defense wanted the court to "become involved" and question Juror number 12. The defense also felt that there was increasing media and public pressure that justified moving for a mistrial. In support of the motion, defense counsel related his own experience of name-calling, threats, and protests that seemed to be aimed at influencing the progress of the trial. The court found no basis for a mistrial and declined to inquire further of Juror number 12 because the allegations were hearsay, if not double hearsay, and unrelated to the juror's duty to decide the case based on the evidence alone. It suggested the parties were free to follow up on the matter to find out if there was further basis for the claim.

Two days later, one of the alternate jurors reported she felt that she and Juror number 2 had been followed when they left the courthouse one evening. She confirmed that nothing about the incident would have any effect on her or prohibit her from fulfilling any duty she was called upon to perform in the trial. When questioned, Juror number 2 did not feel they had been followed. He also confirmed that nothing about the incident would affect his ability to be fair and impartial in the deliberations.

On the same day, the trial court heard and denied another request from the defense to sequester the jury based on what the defense felt was pressure being placed on them by media scrutiny. The court granted the defense's alternative request that the jury be provided a place to gather during breaks and lunch away from the media and public.

### b. *Discussion*

Section 1121 provides, in relevant part, that "[t]he jurors sworn to try an action may, in the discretion of the court, be permitted to separate or be kept in charge of a proper officer." It is well settled that under this statute and prior case law, "sequestration is discretionary with the trial court even in capital cases." (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1218, accord *People v. Gallego* (1990) 52 Cal.3d 115, 169; *People v. Ruiz* (1988) 44 Cal.3d 589, 616.) "The trial court stands in the best position to evaluate the necessity of sequestration in a particular case." (*Ruiz*, at p. 616.) " '[I]n reviewing a trial court's denial of a defendant's motion for individual sequestered jury selection, we apply the "abuse of discretion standard," under which the pertinent inquiry is whether the court's ruling "falls outside the bounds of reason." ' [Citation.]" (*People v. Perez* (2018) 4 Cal.5th 421, 443, quoting *People v. Famalaro* (2011) 52 Cal.4th 1, 34.)

Defendant argues, however, that in this case due process requires a higher standard of review, principally relying on some general language found in *Sheppard v. Maxwell* (1966) 384 U.S. 333 (*Sheppard*), regarding the increasing prevalence of unfair and prejudicial media coverage of pending trials that may impact a defendant's constitutional right to "receive a trial by an impartial jury free from outside influences." (*Id.* at p. 362.) The high court stated that "trial courts must take strong measures to ensure that the balance is never weighed against the accused" and "appellate tribunals have the duty to make an independent evaluation of the circumstances." (*Id.*, at pp. 362-363.)

But this language from *Sheppard* was not directed at the standard of review of a trial court's choice of method for ensuring the jury is not subject to any such prejudicial influences from the media. Instead, the high court's observations were made in the context of the defendant's failed attempt to obtain a change of venue and the subsequent effect of the intense media presence and coverage on the jury and the defendant's verdict. (*Sheppard, supra,* 384 U.S. at pp. 345-349.) The high court was critical of the fact that the trial court in the *Sheppard* case had allowed a table "within a few feet of the jury box and counsel" where "sat some 20 reporters staring at Sheppard and taking notes" and that "[p]articipants in the trial, including the jury, were forced to run a gantlet of reporters and photographers each time they entered or left the courtroom." (*Id.* at p. 355.) The court also pointed out that two of the sitting jurors admitted to learning, during the trial, of "the highly inflammatory charge that a prison inmate claimed Sheppard as the father of her illegitimate child." (*Id.* at p. 357.)

It was the extraordinary circumstances involved in the *Sheppard* case, where "bedlam reigned at the courthouse," because of the oppressive nature of the media's presence both inside and outside the courtroom, resulting in a "carnival atmosphere," that triggered the finding of a constitutional violation. (*Sheppard, supra,* at pp. 355, 358.) Those circumstances do not exist here. We conclude, therefore, in accordance with our prior case law, that a trial court's decision whether to sequester a jury is subject to an abuse of discretion standard of review. We find no abuse of discretion here.

First, we disagree with defendant that the trial court abdicated its responsibility to decide whether to sequester the jury, leaving it up to the jury to choose. The trial court

70

recognized and explicitly told the jury "that it was the court's responsibility to make such decision." The court informed the jurors that, in making its decision, it would take their concerns and preference "into account." The court did so, but in denying defendant's requests for sequestration, it also weighed the fact that "self-policing" appeared to be working and that sequestration has its "own pitfalls."

Second, as demonstrated by our extensive summary of the relevant proceedings, the record reflects that the trial court carefully and repeatedly addressed the potential impact of media coverage, peer pressure, and public sentiment by ordering the jurors to avoid any publicity regarding the case, admonishing them concerning their duty to decide the case solely based on the evidence presented, inquiring about the impact of outside influences on their ability to be fair and impartial, and crafting when necessary methods by which outside influences could be reduced or avoided. Defendant has not pointed to anything in the record suggesting that the jurors failed to abide by the court's orders and admonishments or misrepresented their continued ability to decide the case fairly on the trial evidence alone. "[W]e cannot assume on a silent record that they ignored [such orders and admonishments] and were exposed to prejudicial material." (*People v. Ruiz, supra,* 44 Cal.3d at p. 617.) Indeed, the trial court expressly noted at one point that it had "every reason to believe [the jurors were] abiding by the court's orders." Certainly, in the absence of any evidence that the jury was materially affected by the publicity and interest that this case generated, we cannot say there was any "substantial likelihood" that defendant did not receive a fair trial, as defendant urges.

5. *Joinder of the Child Pornography Charge with the Murder and Kidnapping Charges; Denial of Defendant's Motion to Sever*

Defendant contends that the misdemeanor possession of child pornography charge alleged against him in count three (former § 311.11, subd. (a)[6]) did not meet the statutory requirements for joinder with the charges of capital murder and kidnapping. (§ 954.) Even if it did, defendant claims the trial court abused its discretion in denying severance. We conclude the child pornography charge was properly joined with the murder and kidnapping charges. We further conclude defendant failed to preserve the claim that the trial court abused its discretion in denying severance, although we would find no error in any event.

a. *Background*

Defendant filed a pretrial motion to sever the child pornography charge from the kidnapping and murder charges on the ground that it was improperly joined to such charges under section 954. Defendant did not request discretionary severance. The court deferred consideration of the severance motion until it ruled on defendant's related motion to exclude any evidence of pornography under Evidence Code section 1101.

At the in limine hearing that followed, the prosecution identified the portion of pornographic materials found in defendant's home office that it proposed to introduce as evidence at trial. First, there were six video clips each lasting

_____

[6] In 2006, section 311.11 was amended to classify a first-time commission of the offense as a "wobbler." (Stats. 2006, ch. 337, § 23.) In 2007, a first-time commission of the offense was designated a felony. (Stats. 2007, ch. 579, § 38.)

approximately 30 seconds or less, depicting forcible sexual attacks on young girls. Next, there was a photograph depicting a young girl having sexual intercourse with an adult male. Another exhibit was composed of nine individual cartoon or anime images portraying forcible sexual acts; three of which depicted the rape of a female with a fully mature body, but with girlish facial features, and six of which depicted forcible sexual acts with pubescent girls. Two other exhibits contained sequences of multiple anime images showing the rape of females with girlish features, hairstyles, and clothing. Finally, the prosecution offered an exhibit containing another nine photographic images of unclothed pubescent and prepubescent females in what could be considered seductive poses. The six video clips and the first photograph were specifically offered in support of the child pornography charge. All of the images were offered as relevant to defendant's motive and intent in kidnapping and murdering Danielle. It was the prosecution's position that "[t]aken together [the images] provide an extremely rare insight into the reasons for this kidnapping and murder. . . . They demonstrate graphically [defendant's] special attraction to young girls." The prosecution asserted that one of the images even looked similar to Danielle.

The defense responded that because the pornography involving minors was a small percentage of the pornographic materials seized from defendant's computers, it was misleading to suggest that possession of the materials reflected defendant's interest in young girls. The defense suggested that it might have to counter with the entire collection. In addition, the defense argued that the images and video clips were not admissible on the issues of motive and intent without some explicit connection between them and the crimes committed

against Danielle. Finally, the defense contended that the prejudice emanating from this evidence was overwhelming.

The trial court confirmed that the prosecution's evidence would show that "the body of Danielle was found in a nude state, severely decomposed so that the cause of death could not be determined, and there were no biological samples recognizable or identifiable on the body at the time of the autopsy." The prosecution added that the evidence would also show Danielle's fingerprints on a cabinet just above the bed in defendant's motorhome, her blood in the motorhome hallway, and her hair in the motorhome bathroom and other places. In light of the totality of these circumstances, the trial court ruled that the proffered pornography material would be "highly relevant" and "probative" on the issues of motive and intent. Although it did not resolve at the time the question of which of the proffered images would be allowed to be introduced, it expressly found sufficient evidence to sustain the prosecution's theory of admissibility.

Revisiting the issue the following day, the defense contended that the pictures were inadmissible character evidence suggesting that defendant was a pedophile. Because there was no physical evidence that Danielle had been molested, it continued to be the position of the defense that there was no nexus between the images and the charged offenses. The trial court reiterated its ruling from the previous day and added that, balancing the appropriate interests, it declined to exclude the evidence under Evidence Code section 352. The court observed that the prosecution's presentation of the evidence could be succinct and to the point, as it had been at the hearing. The court doubted the claim made by defense counsel that the defense would respond by introducing defendant's entire

collection of pornography. It felt the defense could adequately address its stated concern by establishing that the percentage of images depicting young girls out of the total number of pornographic images on defendant's computers was small. The court observed that the images the prosecution had elected to show were not as inflammatory as some of the photographs that they could have chosen to use.

The trial court subsequently ruled that the video clips, the photograph depicting a young girl having sexual intercourse with an adult male, and the nine photographic images of unclothed pubescent and prepubescent females in seductive poses were admissible evidence on the charge of child pornography, as well as on the other charges. The court ruled that the two sequences of multiple anime images and three of the individual anime images portraying forcible sexual conduct with females depicted with adult bodies were not admissible. However, it concluded that the six individual anime images showing forcible sexual acts with pubescent girls were admissible on the issue of defendant's possible motive and intent.

The trial court next considered defendant's motion to sever the child pornography charge from the other charges in light of its rulings. The defense contended that the child pornography charge was not within the same class of crimes as the kidnapping and murder charges, and that the commission of the one was not connected to the commission of the other two. The prosecution conceded that the child pornography charge was not within the same class of crimes, but referencing its previous argument regarding the admissibility of the child pornography as evidence of defendant's motive and intent in kidnapping and murdering Danielle, it contended that the crimes were clearly

connected in their commission so as to permit joinder. The trial court denied defendant's severance motion.

### b. *Discussion of joinder*

Section 954 permits the joinder of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses." There is no claim that the child pornography charge alleged against defendant is of the same class of crime as the kidnapping and murder charges. The issue is whether the child pornography offense is properly considered to be connected together with the kidnapping and murder of Danielle. "Whether offenses properly are joined pursuant to section 954 is a question of law and is subject to independent review on appeal." (*People v. Cunningham* (2001) 25 Cal.4th 926, 984.)

We agree with the People that the charges here were connected in their commission. " 'Offenses "committed at different times and places against different victims are nevertheless 'connected together in their commission' when they are . . . linked by a ' "common element of substantial importance." ' [Citations.]" ' [Citation.]" (*People v. Valdez* (2004) 32 Cal.4th 73, 119; accord *People v. Alcala* (2008) 43 Cal.4th 1205, 1219 (*Alcala*).) Motive or intent may be such a common element of substantial importance. (*Alcala, supra*, at pp. 1219-1220 and cases cited therein; *People v. Valdez, supra*, 32 Cal.4th 73; *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 958.) In this case, defendant's possession of child pornography reflected an interest in sexual conduct with, indeed sexual assault of, young girls that was highly relevant to explain why he would have kidnapped Danielle and ultimately murdered her. Such interest and motivation had an evidentiary connection to the

kidnapping and murder charges in the physical evidence of Danielle's handprint located near the bed of the motorhome, her blood and hair found in the motorhome, her hair found on defendant's home bedding, and in the fact that she was abducted from her bed at night and her nude body was subsequently left in the desert.

Defendant raises a number of objections to our reaching this conclusion.

First, he points out that there was no evidence that he created the pornographic images seized or that he viewed them immediately prior to Danielle's disappearance. Defendant asserts that to qualify for joinder of the charges, the possession of proscribed pornography had to be connected to the evidence of the kidnapping and murder, and not to some speculation or theory of the prosecution concerning how or why those offenses were committed. He further notes that there was no evidence that any of the images were of Danielle herself or that the images depicted a scene corresponding to the kidnap or murder of Danielle. Defendant refers us to several cases in which such factors, under their respective facts, have been present or have posed an evidentiary concern. But because none of these cases addressed the relevance of those factors as applied to the issue of joinder, they are inapposite. (*People v. Memro* (1995) 11 Cal.4th 786, 864-865; *People v. Clark* (1992) 3 Cal.4th 41, 129; *People v. Guerrero* (1976) 16 Cal.3d 719, 727-728 (*Guerrero*); *People v. Ghent, supra*, 90 Cal.App.3d 944, 955-956, 958; *People v. Bales* (1961) 189 Cal.App.2d 694, 701.) As the People observe, the presence of any of these factors would have made the evidence all the more damaging to defendant, but the absence of these factors does not compel a conclusion that, under the

circumstances present here, the child pornography charge was unconnected to the charged kidnapping and murder.

Defendant appears to assume that intent or motivation cannot constitute evidence connecting crimes for purposes of joinder and, instead, that such connection can be made only through physical evidence or objectively measurable factors. But we have previously rejected the argument that the lack of physical evidence or other objectively measurable factors is necessary to establish the appropriateness of joinder. Instead, we have expressly held that a connected intent or motivation, including a sexual motive, is sufficient in and of itself to establish the appropriateness of joinder. (*Alcala, supra*, 43 Cal.4th at p. 1220 [rejecting the contention that "intent or motivation cannot constitute a 'common element of substantial importance,' and, instead, only physical or objectively measurable factors, such as use of a specific individual weapon, can suffice" for joinder].)

Defendant next contends that the unclothed state of Danielle's body provides insufficient evidence of sexual motivation and intent. He principally relies on *People v. Craig* (1957) 49 Cal.2d 313, 318-319 (*Craig I*). In *Craig*, the issue was whether the evidence supported a theory of first degree felony murder perpetrated in the commission or attempted commission of a rape. (*Craig, supra*, at p. 318.) The lacerated and battered body of the victim was found lying under a car, legs spread slightly apart, clothed in a raincoat over a nightgown or slip and panties. Each of the garments had been torn open, exposing the front of the body, but there was also evidence that the body had been dragged some 20 to 25 feet. (*Id.*, at p. 316.) We concluded the evidence indicated a "terrific struggle," but did not suffice to prove the killing was committed in the attempt to commit rape

or in the commission of rape. (*Id.*, at p. 319.) The issues before this court in *Craig*, and the other cases cited by defendant (*People v. Johnson* (1993) 6 Cal.4th 1, 41-42; *People v. Anderson* (1968) 70 Cal.2d 15, 34-36; *People v. Granados* (1957) 49 Cal.2d 490, 497), are distinguishable from the issue of joinder presented here. (See *People v. Thomas* (1992) 2 Cal.4th 489, 527 [distinguishing the issues considered in *Craig* and *Guerrero*].) Here we are examining the prosecution's proposed evidence to determine whether there is a substantial connection between the alleged crimes for purposes of joinder. That inquiry does not depend on the sufficiency of the evidence that a sexual assault was ultimately attempted or completed.

Moreover, contrary to the argument of defendant, there was other evidence besides the child pornography that suggested a sexual motivation for the kidnapping and murder of Danielle. There was the evidence of her abduction from her bed at night, her handprint found on the cabinet above the bed in defendant's motorhome, her hair found in his home bedding, and the absence of any clothing on or near her decomposed body. We are not persuaded by defendant's claim that the implication from the location of Danielle's handprint is diminished significantly because a motorhome is such a cramped space. That Danielle's handprint was found near the bed, therefore, still retained evidentiary significance.

We conclude that the child pornography charge was validly joined with the kidnapping and murder charges under section 954.

### c. *Discussion of discretionary severance*

Because it ordinarily promotes efficiency, joinder "is the course of action preferred by the law." (*Alcala, supra*, 43 Cal.4th

at p. 1220.) "Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause." (*People v. Simon* (2016) 1 Cal.5th 98, 122.)

"When exercising its discretion, the court must balance the potential prejudice of joinder against the state's strong interest in the efficiency of a joint trial." (*People v. Arias* (1996) 13 Cal.4th 92, 126 (*Arias*).) To successfully claim that the trial court abused its discretion in denying a motion to sever, a " ' "defendant must make a clear showing of prejudice" ' " by demonstrating that the denial "exceeded the bounds of reason." (*People v. Capistrano* (2014) 59 Cal.4th 830, 848 (*Capistrano*).) "An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling." (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).) " '[A] party seeking severance must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial.' " (*Alcala, supra,* 43 Cal.4th at p. 1222, fn. 11, quoting *Arias, supra,* 13 Cal.4th at p. 127; accord, *People v. Soper* (2009) 45 Cal.4th 759, 773-774 (*Soper*).)

"In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case." (*People v. O'Malley* (2016) 62 Cal.4th 944, 968 (*O'Malley*).) "We then balance the potential for prejudice to the

defendant from a joint trial against the countervailing benefits to the state." (*Soper, supra*, 45 Cal.4th at p. 775, fn. omitted.) However, "[i]f the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' [Citations.]" (*Merriman, supra*, 60 Cal.4th at p. 38.)

Defendant complains that it is not clear that the trial court even considered the relevant factors and exercised its discretion in denying his motion for severance. He argues that, in any event, the denial of his motion was an abuse of discretion.

Defendant contended in his written motion and oral comments to the trial court that the child pornography charge alleged in count three did not meet the statutory requirements for joinder with the kidnapping and capital murder charges. He did not request, in the alternative, that the court exercise its discretion to sever the charges if it found the charges to be properly joined. It is not surprising, therefore, that the trial court did not state for the record that it would deny such a request and explain its reasoning. Under these circumstances, we conclude defendant has failed to preserve the claim that the trial court erred in denying discretionary severance pretrial.

Even if we were to find no forfeiture, however, we would not find any error. Here the evidence underlying the child pornography charge would have been cross-admissible at a hypothetical separate trial of the kidnapping and murder charges, as we have discussed in the previous section. Indeed, the cross-admissibility of the two crimes flows in both directions because each crime illuminates the motive for the other.

Defendant's reliance on *People v. Page* (2008) 44 Cal.4th 1, does not persuade us otherwise. In *Page*, defendant claimed prejudicial error in the admission of pornographic magazines to show his intent in committing a lewd act on a child. (*Id.*, at p. 39.) We found that the magazines "may have been probative with respect to defendant's commission of the crimes," although we found them to have "less probative value than the images considered in prior cases." (*Id.*, at p. 40.) But we declined to reach the issue of whether the trial court abused its discretion under Evidence Code section 352 in admitting the magazines because we found any error to be harmless under the circumstances. (*Id.*, at pp. 41-45.) Because *Page* did not reach the issue of admissibility, it does not assist defendant's claim that evidence of his possession of child pornography was irrelevant to the kidnapping and murder charges and therefore, not cross-admissible. Moreover, the nature of the child pornography possessed by defendant here provided a much stronger inference of motive and intent than apparent in the magazines possessed by the defendant in *Page*. (*Id.*, at p. 39.)

Further, if we were to reach the remaining three discretionary severance factors, we would still find no abuse of discretion. The second factor considers whether an inflammatory offense is being joined to one that is not inflammatory "under circumstances where the jury cannot be expected to try both fairly." (*People v. Mason* (1991) 52 Cal.3d 909, 934.) "The danger to be avoided is 'that strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." (*Ibid*; accord *Capistrano*, *supra*, 59 Cal.4th at p. 850.) Here the charge of possessing images of child pornography was no more inflammatory than the charges of kidnapping a young girl from her bed at night,

murdering her, and leaving her body to be ravaged by animals in the desert. The evidence supporting each crime was strong, and this defeats the notion that strong evidence of one inflammatory crime was improperly used to bolster any weak evidence supporting the other crime. In fact, defendant concedes, relevant to both the second and third factors, this was not a situation where "a weak case [was] joined with a stronger case" creating a "spillover effect of aggregate evidence [that] might alter the outcome of some or all of the charges." (*O'Malley, supra*, 62 Cal.4th at p. 968.) Finally, the joinder of the child pornography charge did not convert defendant's case into a capital one. (*Ibid.*)

### 6. *The Trial Court's Admission of Additional Pornography Evidence*

At trial, the prosecution presented, through the testimony of its computer forensic examiner, James Watkins, Jr., a limited subset of the still images and video child pornography found recorded on CD-ROM's and zip disks located in defendant's home office. The trial court subsequently ruled, however, that by its cross-examination of Watkins, the defense opened the door to the admission of almost all of the rest of defendant's collection of pornography.

Defendant claims that he did not "open the door" and if the cross-examination was in some way misleading, the appropriate remedy was corrective redirect examination by the prosecution, not the admission of additional pornography. Defendant contends the trial court abused its discretion under Evidence Code section 352 by allowing Watkins to describe and the jury to view the additional pornography. Defendant further asserts that admission of the additional evidence revealed the gross unfairness of the joinder of counts. Defendant argues the trial

court's rulings undermined the fundamental integrity of the trial and amounted to a violation of due process. We find no error.

### a. Background

As previously recounted, a pretrial hearing was held regarding defendant's motion to sever the child pornography charge and related motion in limine to exclude the child pornography found on defendant's computers and related storage mediums. At the hearing, the prosecution proffered a limited number of images and video it intended to introduce, both as evidence of defendant's possession of child pornography and of his intent and motive in kidnapping and murdering Danielle. The trial court further narrowed the images that it would allow, exercising its discretion under Evidence Code section 352. In so doing, the court indicated, among other things, its belief that the defense could adequately respond to the prosecution's introduction of the child pornography by establishing that the percentage of images depicting young girls was small when considered in light of the total number of pornographic images possessed. The court also observed that the images the prosecution had elected to show were not as inflammatory as some of the photographs that it could have chosen to use.

During its case-in-chief, the prosecution called forensic examiner Watkins to testify about the "questionable" digital images — images that in his view were pornographic depictions of children under the age of 18 — that he found on two CD-ROM's and three zip disks located in defendant's home office. The prosecution showed the jury fewer than 20 still images, including anime images, plus three movie segments.

On cross-examination, defense counsel elicited that on the four computers and related storage files located in defendant's home, there were approximately 100,000 graphic or digital image files. Out of this total, there were between 8,000 and 10,000 depicting nudes, including adults. Counsel then asked Watkins to confirm that the "17 stills" the jury saw were included in the 8- to 10,000 images. Watkins agreed. Defense counsel, with what the trial court later described as raised eyebrows expressing dismay, responded: "So apparently culled out of a hundred thousand you identified down 8- to 10,000, and then of the 8- to 10,000 you spotted 14 or so that the jury just saw?" Watkins said: "Yes, sir." Defense counsel then confirmed with Watkins that there were also several hundred digital movies in the collection and asked if Watkins had noticed that there was a "common theme" in them of sexual intercourse with mature women. The trial court allowed the questioning over the prosecution's "best evidence" objection, indicating that the court and parties would likely need to discuss the matter further. Defense counsel continued by asking whether virtually all of the movies depicted adults engaged in various consensual sex acts. Watkins agreed. Returning to the 8- to 10,000 still images, counsel asked Watkins to confirm that the theme of such images was large-breasted women. Watkins responded that "there were a large amount of those." Defense counsel pressed Watkins whether this was not also true of the movies. Watkins agreed that "there were quite a few of those."

At the beginning of the redirect examination of Watkins, the prosecution indicated that it wished to mark two binders for identification, containing all of the pornographic images seized from defendant's home office. The trial court stated that it thought doing so would be appropriate. Defense counsel

immediately asked for a sidebar conference. The trial court excused the jury and the matter was discussed outside its presence.

The court informed defense counsel that by virtue of his cross-examination, he had "put everything in issue." The court stated: "You've represented to this jury, . . . that out of a hundred thousand images there are only 13 that are such that the District Attorney can find against your client. You know, I know, that is not true." The trial court reminded defense counsel of the proceedings on the in limine motion and the fact that the court had directed the prosecution to pare down the number of images it intended to use at trial out of those that were admissible. The court said it took such action under Evidence Code section 352 for the specific purposes of minimizing defendant's exposure to the prejudicial impact of this evidence. But, according to the trial court, the defense turned around and tried to suggest the images introduced were the only such images found.

The defense denied that it had opened any door, although counsel acknowledged that Watkins's report indicated there were about 80 questionable images. Defense counsel complained that the prosecution had not requested a sidebar; instead objecting on the grounds of best evidence — a rule no longer in existence. The trial court responded that if the defense had any doubt concerning the trial court's position on the matter it could have requested a sidebar instead of immediately going "for the jugular" in cross-examination. The court explained that the trial was "a search for the truth . . . and the truth is there are more than 13 images." The court indicated it would allow the jury to look at all of the identified pornographic material if it wanted to do so.

The discussion between the court and counsel continued the next day with the defense maintaining its position that no door had been opened, that its cross-examination was within the scope authorized by the court during the pretrial hearing, and that if the defense had opened any door, Evidence Code section 352 nevertheless required the evidence to be excluded. The trial court responded that it believed defense counsel had intentionally and strategically questioned Watkins in a manner that left a "false impression" with the jury, which was not contemplated by the court's prior ruling and which the prosecution was entitled to correct. The court specifically ruled that the prosecution would be allowed to establish the true number of child pornography images and the nature of the other items.

The defense asked for a specific "352 ruling" regarding a set of photographs depicting defendant's girlfriend, Susan L., and her daughter, Danielle L. The prosecution explained that it intended to show Watkins several images, including the photographs of Danielle L., and to have him describe the images but without showing them to the jury. The court reviewed the photographs of Danielle L., indicating for the record that four of them showed a young girl laying on a sun chair with her legs spread apart. The photographer in one of the photographs was taking the shot from an angle near the bottom of the chaise lounge, "shooting directly up the crotch area" of the young girl. The court agreed that Watkins could describe the content of the picture, but reserved ruling on whether the jury would be permitted to see it.

The defense then asked the court to address several images depicting bestiality. The prosecution indicated that it intended to have Watkins describe them generally. The court

found that based on defense counsel's prior cross-examination and accompanying "theatrics," it would allow the prosecution to do so.

In the jury's presence, on redirect, Watkins clarified that when he stated that there were a total of 100,000 graphic image files, that number included every single image on the computers, including all icons, arrows, buttons and things of that nature. Watkins identified the two binders that had been previously marked and described them as containing about 8,000 images, including cartoon and anime images, showing mostly adult women, naked, and often engaged in sexual acts. Also included in the binders were images of nude or partially clothed children beyond those already shown to the jury. He described two series of anime images he found that showed a young girl who is assaulted, bound, and ultimately raped. The images had accompanying dialog text. From the bedroom computer, Watkins testified that he recovered several digital photographs of bestiality, by which he meant "a person having sex acts with animals." Watkins briefly described a set of images showing his girlfriend's daughter, Danielle L., in a "portrait-type setting" and sunbathing in a bikini on a chaise lounge with her legs spread. Watkins also described some of the cartoons that were organized into digital file folders with labels of "Jetsons," "Flintstones," "Star Trek," and the like. In the folder marked "Jetsons," there were images depicting the father having sexual relations with his daughter. Other images were pictures of Mrs. Jetson unclothed. Other folders, including the "Flintstones" and the "Simpsons," were similar.

On recross-examination, defense counsel asked Watkins to confirm that he had identified only 85 images of possible child pornography out of the 8- to 10,000 images of pornography; a

percentage of about 1 percent. The jury had seen 15 to 17 of those 85. Watkins agreed, but noted that there were several images that were "borderline" as to the subject's age, and he did not include those in the 85 he deemed questionable. Out of the 2600 movies Watkins examined, he believed 39 of them depicted juveniles under the age of 18; two of which had been shown to the jury.

The defense subsequently moved for a mistrial based on two grounds — the ruling allowing all of the pornography into evidence and the denial of the severance motion. Defense counsel noted for the record that several women jurors began to cry when watching the videos. The trial court denied the motion.

Ultimately, the trial court directed the prosecution to eliminate duplicate images from the two binders, but otherwise admitted them into evidence. It indicated, however, that the evidence would not be given to the jurors for deliberations unless they requested it. The court ruled that the bestiality photographs would remain part of the record because they had been referenced in testimony, but they would be sealed separately and the jury would not be allowed to see them even if requested. During deliberations, the jury requested to see the pornography evidence. The jury was provided the two binders and the photograph of Danielle L.

### b. Discussion

Defendant contends defense counsel did not "open the door" to the admission of the additional pornography and that if his counsel's cross-examination was in some way misleading, the appropriate remedy was corrective redirect examination by the prosecution regarding the total number of questionable

images located by Watkins in the collection of pornography he examined. We disagree.

Our review of the record shows that the trial court, in ruling on defendant's pretrial in limine motion, carefully circumscribed the pornography evidence that the prosecution would be allowed to introduce. And at trial, the prosecution initially offered, through the testimony of its forensic examiner Watkins, less than what was permitted by the court's pretrial ruling. As the trial court recognized during the pretrial proceedings, it would have been permissible for the defense to counter the prosecution's evidence with testimony establishing that the percentage of images depicting young girls out of the total number of pornographic images on defendant's computers was small.

On cross-examination of Watkins, however, defense counsel did not elicit the total number of questionable images and the total number of pornographic images that Watkins located so as to establish an approximate ratio of the one to the other. The defense questioning, accompanied by the theatrical body language described by the trial court, instead misleadingly suggested that out of 8- to 10,000 pornographic images in defendant's collection, the prosecution could find only the less than 20 questionable images that it had shown to the jury. The defense knew this was not true. The images and segments of video introduced at this point were both fewer in total number and, according to the trial court, less inflammatory than other images and videos depicting young girls found in defendant's collection. Moreover, defense counsel went on to ask Watkins whether the "theme" of the pornography collection was in fact sexual acts with large-breasted adult women. In effect, the defense suggested the child pornography was not only limited in

quantity, but importantly, was substantively a subject of little interest to defendant while ignoring the existence of numerous "borderline" pictures. Defendant implicitly suggested to the jury that the videos and images it had seen were not representative of defendant's sexual interest or fantasies.

The prosecutor objected based on "best evidence." Defendant contends the testimony sought by the defense cross-examination was not subject to the best-evidence rule, which in its traditional form no longer exists. (See Evid. Code, § 1521.) The prosecutor's objection, however, may have reflected the idea that a review of the remainder of the pornography collection would best reveal whether the images of young girls was as de minimis in quantity and substance as defendant claimed. The full collection would more accurately establish the true nature of defendant's sexual interests.

This concept is properly embodied by Evidence Code 356, the rule of completeness. Evidence Code section 356 provides, in relevant part, that "[w]here part of [a] . . . writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . ; . . . when a writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of Evidence Code section 356 is to avoid creating a misleading impression." (*People v. Samuels* (2005) 36 Cal.4th 96, 130.)

Under the rule of completeness, we agree with the trial court's response that by its cross-examination, the defense had "opened the door" to the admission of the other pornography evidence. (Evid. Code, § 356; see *People v. Vines* (2011) 51 Cal.4th 830, 861; *People v. Sakarias* (2000) 22 Cal.4th 596, 643-

644.) The additional pornography became relevant in order for the jury to test defendant's implicit assertion that the pornography in his collection did not reflect a particular sexual interest in young girls, much less an interest in violent sexual assault of young girls. Under the circumstances, the prosecution was not limited to corrective redirect examination in order to counter defendant's apparent attempt to mislead the jury.

Nor did the trial court abuse its discretion under Evidence Code section 352 by allowing Watkins to describe and the jury ultimately to view the additional pornography. "A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.) The trial court's decision to allow Watkins to testify regarding the remainder of defendant's collection and to allow the jury on request to view the collection, minus the images of bestiality, was not abuse of discretion under the circumstances.

Finally, because the additional evidence was properly introduced, defendant has shown neither gross unfairness in the joinder of counts nor a violation of due process.

### 7. *The Cross-Examination of Susan L.*

The prosecution portrayed defendant's series of activities on the weekend of Danielle's disappearance as being highly suspicious. The defense called defendant's former girlfriend, Susan L., to testify that such activities were not uncommon for defendant. Her testimony also suggested that she was comfortable bringing her children on camping trips with defendant.

Specifically, Susan L. testified that she had been camping with defendant in his motorhome more times than she could count. Her children, including her daughter Danielle L., often accompanied them. On occasion they went to Silver Strand to camp, but when the weather was bad, they left after only a couple of hours and went instead to the desert at Borrego. Sometimes they arrived in the desert at night. Susan recalled getting stuck in the sand at the desert several times. Defendant would dig the sand out from the wheels and put boards underneath in order to get out. They would abandon the boards because once they were going, they could not stop for fear of getting stuck again.

Susan L. testified that when defendant was planning a camping trip, he would park the motorhome near his home. Sometimes the motorhome was parked for two days prior to camping. When the motorhome was being loaded, its front door would sometimes be open. Susan said that the area was a family neighborhood with children out walking on the sidewalks. According to Susan, the last thing that they would do before leaving to go camping was fill the motorhome with water. When they were finished, they would just throw the hose in the front yard.

On cross-examination, the prosecution attempted to show that, despite Susan L.'s descriptions, defendant's activities on the weekend of Danielle's disappearance were still out of the ordinary for him. When the prosecution sought to explore two other areas of cross-examination, however, defendant objected. Defendant now argues on appeal that the trial court prejudicially erred in overruling his objections.

First, defendant complains that the prosecution was allowed to question Susan L. regarding an incident that defendant characterizes as an alleged stalking. The questioning arose in the following context.

The prosecution elicited from Susan L. that she had twice left defendant and was no longer living with him, but that she still cared about him. She had last seen defendant about three weeks before his arrest. At that time, she had already broken up with defendant and she was out with a male friend. At the end of the evening, the friend walked her to the door and gave her a kiss on the cheek. At trial, Susan said she did not see defendant at the time, but spoke with him the next day. When the prosecutor asked if defendant told her that he had been present the previous night, defense counsel's objection was sustained. The prosecutor asked to approach the bench.

In the ensuing bench discussion, the prosecutor informed the court that Susan L. had previously told law enforcement that she saw defendant that night, but, regardless, Susan L. also said that defendant called her the following day and told her that he had been present the previous night to tell her about a business opportunity. Defendant stated that he had watched Susan and her friend approach. The defense contended that the inference the prosecution was trying to draw was that defendant was stalking Susan and urged the court to exclude the testimony under Evidence Code section 352. The court expressed concern about the relevance of the proposed testimony. The prosecutor responded it was relevant in that, although Susan L. still thought positively of defendant, it had "freaked her out" that he was surreptitiously present on this occasion. The court ruled that the prosecutor would be allowed to go into "her state of mind," specifically "that she didn't have good feelings for him

back on that particular date," because that would be "in conflict with the way she is today." However, it ordered the prosecutor not to elicit testimony that she had "freaked out."

When cross-examination resumed, the prosecutor impeached Susan L. with a transcript of her interview with law enforcement in which she stated that she had found defendant sitting outside that night. Susan also responded that defendant had called her the next day. She admitted that after their conversation, she did not feel comfortable with defendant "at that time."

Defendant argues the trial court erred in allowing this cross-examination. He concedes that evidence a witness bears enmity towards a party *against whom* he testifies is relevant to show bias — just as evidence that a witness is friendly toward a party *for whom* he testifies is also relevant to show bias. Therefore, as defendant concedes, the prosecutor's questioning of Susan L. concerning whether she still cared for defendant was appropriate. But, defendant argues, the questioning of Susan L. regarding the incident of alleged stalking suggested only that she should be hostile to defendant and accordingly, it was not proper impeachment of her testimony in favor of defendant. In defendant's view, the testimony was inadmissible character evidence. (Evid. Code, § 1101, subd. (a).) We are not persuaded.

"The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) "The state of mind of a witness as to bias, prejudice, interest involved, friendship or hostility toward a party are all proper subjects for investigation in the trial of a case." (*People v. Sweeney* (1960) 55 Cal.2d 27, 41.) In exploring

such states of mind, we agree with the People that a witness may be impeached with evidence that she has previously held an opinion concerning a party different from her opinion expressed at trial. (*People v. Price* (1991) 1 Cal.4th 324, 474.) Defendant offers no authority supporting his claim that the prosecution could not both suggest Susan L.'s testimony in favor of defendant was biased because she still cared for him and at the same time impeach her implicit testimony that she felt comfortable with defendant by pointing out that she did not always feel that way. We conclude the trial court acted within its discretion in allowing this line of questioning.

In another area of cross-examination, the prosecution asked Susan L. if defendant would drink alcohol when they went out to the desert. She testified that he did. The prosecution then asked if defendant's attitude or personality would change when he drank. Defense counsel objected on grounds of Evidence Code section 352 and that the question called for inadmissible character evidence. The trial court overruled the objection and Susan answered that she did notice a change in defendant's behavior when he drank. He became quiet, sometimes "a little upset," and depressed. His drinking was one of the reasons Susan left him.

Later, the prosecutor asked to approach the bench. He told the court that he had a transcript of an interview with Susan L. in which she stated that when defendant drank he became sexually and verbally abusive. The prosecutor represented that he would not elicit this, but he did want to ask Susan if defendant became more "forceful" when he drank. Defense counsel objected that, among other things, such testimony would constitute inadmissible character evidence. The trial court observed that the evidence was overwhelming

that defendant had been drinking on the night Danielle disappeared. It stated that Susan L. was a "percipient witness" regarding how defendant "changes when he [has] been drinking," which it found to be relevant and probative. The court stated that the proposed testimony would not be "character evidence in the true sense" and overruled defendant's objection. The prosecutor proceeded to ask Susan if defendant would become forceful when he had been drinking and she answered that she remembered "an occasion that he did."

Defendant contends the trial court erred in allowing Susan L. to testify concerning defendant's "character for violence when intoxicated," and that such evidence is generally prohibited character evidence under Evidence Code section 1101, subdivision (a). But even assuming the trial court erred, we conclude that the error in admitting this testimony was nevertheless harmless. The physical evidence against defendant — Danielle's hairs found in the bedding of defendant's master bedroom, her handprint above the motorhome bed, the presence of her blood and hair in the motorhome, and the significant fiber evidence — combined with defendant's strange activities over the weekend of her disappearance, his weak explanations to investigating officers, and the evidence of his interest in child pornography as a possible motive, presented a strong case supporting defendant's guilt. The alibi entomological evidence presented by the defense was powerfully rebutted. In this context, it is not reasonably probable that the jury's verdict would have been different if it had not heard from Susan L. that on one occasion defendant had been forceful with her when he had been drinking. (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

Finally, defendant fails to persuade us that this error, even combined with any assumed error in allowing the other challenged cross-examination of Susan L., resulted in a fundamentally unfair trial that offends due process. (*People v. Partida, supra,* 37 Cal.4th at p. 439.)

### 8. *Restriction on Defendant's Cross-Examination of Officer Redden*

San Diego Police Officer Paul Redden interviewed defendant on the afternoon of February 4, 2002, and administered a polygraph examination. At trial, the prosecution called Redden to testify and introduced a version of the taped interview that had been redacted to eliminate all references to the polygraph examination, which evidence is inadmissible under Evidence Code section 351.1 as we have previously noted. In the cross-examination of Redden, defendant sought to elicit other discrete portions of the interview, but was warned by the trial court that if he did so, the entire interview might become admissible. Defendant claims on appeal that the trial court's restrictions on his cross-examination of Redden violated his right to present evidence under Evidence Code section 356, as well as his Sixth Amendment right to confrontation. We disagree.

### a. *Background*

Defense counsel began his cross-examination of Redden by asking him how many hours he spent with defendant and how many times defendant asked him for counsel. The trial court sustained the prosecutor's Evidence Code section 352 objections to both questions. At a bench conference outside the hearing of the jury, the court explained that it had made pretrial rulings regarding the admissibility of the interview tape and that

defendant's requests for counsel were contained in the excluded parts of the interview. It warned defense counsel that further questioning in this area would come "dangerously close to opening up this entire interview." Defense counsel responded that his questions went to the voluntariness of defendant's responses, an issue defendant was entitled to present to the jury. The court responded that it had ruled on defendant's motion for exclusion that the interview was voluntary and that it had based that ruling on "the entire tape." If defense counsel wanted to pursue this line of questioning, the court warned again, it would "open the door" to the whole tape being admitted into evidence, and yet that would be defendant's choice. Defense counsel stated that "[g]iven the court's ruling," he would not "go there," yet wanted to voice his objection "as to the voluntariness."

Later, defense counsel asked Redden whether he had asked defendant what his job was. Redden said yes. When counsel asked what defendant had told him, the prosecutor objected. Defense counsel responded "[Evidence Code section] 356." The trial court called counsel to a second bench conference at which it reminded defense counsel that the court and prosecutor had done everything they could to excise references to inadmissible evidence in the interview tape and transcript and that by asserting section 356, the court understood defense counsel to be implicitly requesting the introduction of the entire interview. The court noted that the defense could make such a strategic move and that it could give a limiting instruction to the jury, but it wanted to make it clear that counsel was "on the brink of bringing [the entire interview] in." Defense counsel denied that his assertion of section 356 constituted a request to admit the entire interview. Rather, counsel said, he was trying

to introduce portions of the interview that were relevant to the jury's consideration of matters contained in the redacted tape. The court suggested that defense counsel should have raised these concerns when the tape was being edited. Counsel responded that it had simply been assumed that the defense would be permitted to probe these areas. The prosecutor objected that the defense was really trying to introduce sympathetic character evidence. The court ruled that the defense could not cross-examine regarding matters that were not on the tape.

Defense counsel then noted that the tape contained two statements by defendant in which he used the word "we" when talking about a stop he made during his weekend travels. In order to explain defendant's usage of the pronoun, defense counsel felt it was necessary to establish a foundational record that defendant had been in custody for a long time, he was fatigued, he had not eaten breakfast, he did not have a lot of sleep, and he had asked for counsel. The trial court ruled that the defense could ask Redden about his observations regarding whether defendant appeared fatigued, but the court remained concerned that other questioning would alert the jurors to the fact that the tape had been redacted, something the defense had not wanted them to be told. It ruled that defendant should "work with the tape you've got" at the risk of opening the door. Defense counsel subsequently elicited from Redden, without objection, that defendant told him that he had five hours of sleep the previous night and that he had not eaten.

After Redden finished testifying, however, defendant raised the matter again and offered to waive any objection to the jury learning that the tape had been redacted. In a further discussion outside the presence of the jury, the trial court

repeated its belief that the parties had worked together to edit the tape. But, the court stated, if defense counsel still wanted to probe other areas not covered by the tape, it offered to provide a limiting instruction informing the jury that "there were redactions and that those redactions somehow didn't get into the tape and that these other issues were covered." It again warned defense counsel "that this is a slippery slope . . . because the context of the Redden interview [wa]s the entire interview" and at some point, the entire statement would have to be introduced in order for the jury to understand the points being made. The court left it up to the defense whether to recall Redden. The defense did not recall him.

### b. *Discussion*

Defendant reasserts on appeal that he had a right to submit the facts regarding the voluntariness of his interview statements to the jury for its consideration of the reliability of the statements. (*Crane v. Kentucky* (1986) 476 U.S. 683, 689-690.) Defendant claims that he also had a right to question Redden regarding the context of his use of the pronoun "we" when he told Redden about making a stop during his weekend travels. Defendant contends the pursuit of these relevant lines of inquiry would not have opened the door to introducing the inadmissible portions of the tape concerning his polygraph examination. (Evid. Code, § 351.1.) In support, defendant cites cases stating the principle that a party cannot take advantage of another party's improper introduction of inadmissible evidence by failing to object and then claiming the door had been opened to further inadmissible evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1271-1273 (conc. opn. of George, C. J.) (*Steele*); *People v. Gambols* (1970) 5 Cal.App.3d 187, 192 (*Gambols*); *People v. Arends* (1958) 155 Cal.App.2d 496, 508-509 (*Arends*).)

Defendant, therefore, asserts the trial court erred in ruling that further cross-examination of Redden would open the door to admission of the entire interview, and he claims that, as a result, he had no real choice but to forego further questioning.

We agree that defense counsel's effort to cross-examine Redden about whether defendant had asked for an attorney did not constitute a waiver of the broad protection afforded by Evidence Code section 351.1, which prohibits any reference to "the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination."  (Evid. Code § 351.1, subd. (a).)

But we reject defendant's contention that the circumstances underlying *Steele*, *Gambols,* and *Arends* were present here.  No inadmissible evidence had been admitted, and the trial court's ruling did not give the prosecution permission to introduce the entire tape containing the inadmissible polygraph evidence after a failure to object.

In any event, the court's warnings did not prejudicially affect the evidence before the jury.  Defendant's comments about procuring a lawyer occurred after he had been told that he had failed the polygraph examination and were made in direct response to his failure of that test.  For this reason, the parties had originally agreed to redact these portions of the interrogation.  Consequently, whether defendant had requested an attorney does not seem strongly probative on the issue of whether defendant had made the "we" reference because he was tired.

We also note that defendant was able to elicit from Redden that defendant said he had only five hours of sleep the previous night and that he had not eaten. Thus, defendant was able to argue he was fatigued and hungry at the time of the interview, which

could explain his "slip" in using the pronoun "we." As defendant notes in his reply brief, there was also testimony that defendant often was accompanied by others when he took his motor home excursions. Nothing prevented defendant from arguing that defendant's use of the plural pronoun when describing such excursions was a matter of habit. In sum, even if we were to find error, it would be harmless given the other means by which defendant could have raised the same points and in light of the strength of the evidence against him. (*Arias, supra*, 13 Cal.4th at pp. 156-157 [applying harmless error standard of *People v. Watson, supra*, 46 Cal.2d at p. 836 to claim of error under Evid. Code § 356].)

### 9. *Exclusion of the February 15 Anonymous Telephone Call to Brenda Van Dam*

Defendant claims the trial court erroneously refused to admit evidence that Brenda Van Dam received a telephone call from an anonymous man on February 15, 2002, who asked her if she wanted her daughter back, and told her that Danielle had been abused but was still alive. In defendant's view, the telephone call supported his alibi defense because it was consistent with the testimony of his entomological expert Faulkner, who opined that Danielle's body was first available for insect activity on February 16. Defendant offered the telephone call as a declaration against the caller's interest pursuant to Evidence Code section 1230 and also argued its admissibility on federal due process grounds.

Evidence Code section 1230 provides that the out-of-court declaration of an unavailable witness may be admitted for its truth if the statement, when made, was so far against the declarant's interests, penal or otherwise, that a reasonable person would not have made the statement unless he or she believed it to be true. " 'The proponent of such evidence must

show "that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." ' " (*People v. Geier* (2007) 41 Cal.4th 555, 584.) "The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. [Citation.]" (*People v. Frierson* (1991) 53 Cal.3d 730, 745.) We review the trial court's finding for an abuse of discretion. (*Ibid.*)

We find no abuse of discretion here. The trial court sustained the prosecution's hearsay objection when the matter of the telephone call first came up during defendant's cross-examination of Brenda. It specifically found that the anonymous caller's statements lacked the reliability necessary for their admission. The court reiterated its ruling excluding the evidence when the defense subsequently made a formal motion to have the evidence admitted. It observed that the identity of the caller and the place from which the call was made were unknown. The court also noted the publicity that this case had received and the possibility of a "crank" call being made.

A trial court does not abuse its discretion by finding "that statements by an anonymous tipster fail to satisfy the fundamental requirement of a declaration against interest — that the declarant actually believes himself to be at some significant risk of civil or criminal liability when he makes the

statement sought to be admitted." (*Clark v. Optical Coating Laboratory, Inc.* (2008) 165 Cal.App.4th 150, 171.) Defendant argues, however, that this case falls outside of this rule because there was only one anonymous call conveyed and it occurred under circumstances in which the caller would likely have anticipated that the Van Dams' telephone would be monitored. Indeed, the February 15 call might have been traced but for the fact that the warrant for a "tap and trace" on the Van Dam telephone had been inadvertently allowed to lapse.

It is purely speculative that the person who made the single February 15 telephone call to the Van Dams believed his call would be traced. And even if he thought the communication would be traced, there is no basis to conclude he believed that his identity would thereby be discovered, subjecting him to criminal liability or social opprobrium, within the meaning of Evidence Code section 1230. As the trial court noted, nothing indicated the place from which the telephone call was made. The communication could have easily been made from a number unassociated with the caller precisely in order to maintain his anonymity. Moreover, the caller gave no details regarding the basis for his claimed knowledge that could be tested and given the extensive publicity the case had been receiving, the possibility that the communication was a "crank" call was real. Under these circumstances, the trial court's finding of untrustworthiness was eminently reasonable.

The situation present here is not, as defendant argues, comparable to the exclusion of evidence that otherwise "bore persuasive assurances of trustworthiness" found by the high court to have violated due process in *Chambers v. Mississippi* (1972) 410 U.S. 284, 302. Rather, as we have stated before, the "foundational prerequisites are fundamental to any exception to

the hearsay rule." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 57.) " '[A] defendant does not have a constitutional right to the admission of unreliable hearsay statements.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 269.) Application of "the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense." (*People v. Hall* (1986) 41 Cal.3d 826, 834; accord *People v. Prince* (2007) 40 Cal.4th 1179, 1229.)

### 10. The Adequacy of CALJIC No. 2.16 in Considering Dog-Scent Evidence

As noted in the statement of facts, Jim Frazee, a volunteer canine handler from the San Diego Sheriff's Department, testified that he and his trained search and cadaver dog Cielo were called upon to search defendant's motorhome. Cielo "alerted" to the first storage compartment behind the passenger's door; an area where air from inside the motorhome would naturally escape. When the storage door was opened, Cielo showed "interest" in a shovel and lawn chair that were inside. According to Frazee, Cielo's alert indicated that a body had been some place in the motorhome.

Defendant does not claim error in the admission of the dog-scent evidence. Rather, he claims two errors in the trial court's instruction to the jury regarding its consideration of the evidence. First, he argues that CALJIC No. 2.16, which instructed the jury in its consideration of dog-tracking evidence, was inadequate because it failed to admonish the jury to view the evidence with caution. Second, he argues that CALJIC No. 2.16 is inadequate because it fails to relate the jury's consideration of the evidence to the beyond a reasonable doubt standard of proof. We reject both claims.

### *a. Lack of Cautionary Admonishment*

The admission of dog-tracking or dog-scent evidence[7] was first approved in *People v. Craig* (1978) 86 Cal.App.3d 905 (*Craig II*). The foundational requirements for admission of such evidence were further developed in *People v. Malgren* (1983) 139 Cal.App.3d 234 (*Malgren*). Specifically, the *Malgren* court identified the following five foundational requirements: "(1) the dog's handler was qualified by training and experience to use the dog; (2) the dog was adequately trained in tracking humans; (3) the dog has been found to be reliable in tracking humans; (4) the dog was placed on the track where circumstances indicated the guilty party to have been; and (5) the trail had not become stale or contaminated." (*Id.*, at p. 238.) When the issue was recently presented to us, we approved the admission of dog-scent evidence upon a sufficient foundational showing of the first four *Malgren* requirements. (*People v. Jackson* (2016) 1 Cal.5th 269, 325-326.) We determined that the fifth *Malgren* factor "is not an independent requirement; it is satisfied by evidence that establishes the other four factors." (*Id.*, at p. 325.) We have not, however, had an occasion to consider the jury instruction that should accompany the admission of such evidence.

The trial court in this case instructed the jury with the language of CALJIC No. 2.16, as follows: "Evidence of dog tracking has been received for the purpose of showing, if it does, that the defendant is the perpetrator of the crimes of kidnapping and murder. This evidence is not by itself sufficient to permit an inference that the defendant is guilty of the crimes of

---

[7] CALJIC No. 2.16 refers to this type of evidence as dog-tracking evidence. Under the circumstances here, the evidence is more readily understood as dog-scent evidence.

kidnapping and murder. Before guilt may be inferred, there must be other evidence that supports the accuracy of the identification of the defendant as the perpetrator of the crimes of kidnapping and murder. [¶] The corroborating evidence need not be evidence which independently links the defendant to the crime. It is sufficient if it supports the accuracy of the dog tracking. [¶] In determining the weight to give to dog-tracking evidence, you should consider the training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the tracking in question."

Although CALJIC No. 2.16 specifically instructs the jury that dog-tracking (dog-scent) evidence is not sufficient alone to permit a finding of guilt and that corroboration of the accuracy of the identification is necessary, defendant claims that still more cautionary directions are required. He argues that the instruction is inadequate because it fails to expressly admonish the jury to view the dog-scent evidence "with care and caution" and contends that the trial court had a duty to add such admonition on its own motion.[8] According to defendant, such an express cautionary admonition is necessary because dog-scent

---

[8] Defendant did not object to the instruction on this ground, but raises the claim on appeal relying on section 1259, which provides instructional errors are reviewable "if the substantial rights of the defendant were affected thereby." (§ 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247.) The People do not challenge the applicability of section 1259. But we have previously recognized that "it is more appropriate to permit defendants to determine whether to request the instruction than to require the trial judge to give it in every case" because dog tracking evidence can be either inculpatory or exculpatory. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1192 (*Diaz*).)

evidence, like accomplice testimony, in-custody informant testimony, and evidence of an oral confession or admission by a defendant, presents a substantial risk of "specious reliability." He notes that the dog-scent instruction given in *Craig* included an admonition that such evidence "must be viewed with the utmost of caution." (*Craig II, supra*, 86 Cal.App3d at p. 917.)

The majority of the court in *Malgren*, however, specifically rejected the argument that "the court was obligated to instruct that dog trailing evidence must be viewed with caution." (*Malgren, supra*, 139 Cal.App.3d at p. 241.) It reasoned that "[u]nlike accomplice testimony, dog tracking evidence is not inherently suspect because of a self-interested source. [Citation.] The notion that such evidence is of slight probative value or must be viewed with caution stems at least in part from a fear that a jury will be in awe of the animal's apparent powers and will give the evidence *too much* weight. [Citation.] In light of the stringent foundational requirements which must be met before such evidence is admissible at all, however, we see no reason to categorize that evidence thereafter as inferior or untrustworthy, and instruct that it be given *less* weight than other evidence. The *Craig II* court itself suggested that what the law in this state actually requires is not that dog trailing evidence be viewed with caution, but that it be treated as any other evidence, with its weight left to the trier of fact. (*Craig II, supra*, 86 Cal.App.3d at p. 918.)" (*Malgren*, at pp. 241-242.)

Defendant urges us to disapprove *Malgren* on this point. He argues that dog-scent evidence is "highly problematic" and in this way is akin to accomplice testimony, in-custody informant testimony, and evidence of an oral confession or admission by a defendant, which he asserts have similar questionable reliability and so warrant a cautionary instruction

on its own motion. Subsequent to the filing of defendant's briefing, however, we have concluded that trial courts do not have a duty to instruct the jury on its own motion to view with caution evidence of a defendant's extrajudicial statements. (*Diaz, supra,* 60 Cal.4th, at pp. 1189-1190.) In reaching that conclusion, we started with the observation that a trial court has such a duty to instruct only " 'on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*Id.*, at p. 1189.) We then considered "whether the cautionary instruction [regarding defendant's extrajudicial statements] is one of those 'general principles of law' so 'necessary for the jury's understanding of the case' that the instruction must be given by the trial court even when the defendant does not request it." (*Ibid.*) We ultimately concluded that "[t]he cautionary instruction is no longer '*necessary* for the jury's understanding of the case' [citation] because courts are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony." (*Id.*, at p. 1190.)

Considering defendant's contention in light of this framework of analysis, we conclude an express cautionary admonition regarding dog-scent evidence is not a general principle of law necessary to the jury's understanding of the case. (*Diaz, supra*, 60 Cal.4th at pp. 1189-1190.) First, we agree with the *Malgren* majority that "the stringent foundational requirements which must be met before such evidence is admissible at all" ensure that this type of evidence is not inherently "inferior or untrustworthy," requiring that the jury

be instructed to give it "*less* weight than other evidence." (*Malgren, supra*, 139 Cal.App.3d at p. 241.)[9] Second, we note CALJIC No. 2.16 observes that the "[e]vidence of dog tracking has been received for the purpose of showing, *if it does,* that the defendant is the perpetrator of the crimes of kidnapping and murder." (Italics added.) The highlighted language alerts the jury to consider the possibility that the evidence does not reflect that defendant is the perpetrator. Combined with the language of CALJIC No. 2.16 instructing the jury that dog-scent evidence is not sufficient alone to permit a finding of guilt, that corroborating evidence is necessary, and that the jury should consider the training, proficiency, experience, and proved ability, if any, of the dog, its trainer, and its handler, along with all of the surrounding circumstances, CALJIC No. 2.16 already contains limitations and safeguards ensuring that the jury will carefully evaluate dog-scent evidence. Moreover, the jurors also were apprised of the general rules advising caution in the consideration of circumstantial evidence. (CALJIC No. 2.01.) A further cautionary instruction is neither necessary nor appropriate for the jury's understanding.

---

[9] Defendant fails to persuade us that the foundational requirements are so easy to satisfy in this "age of the credential and the certification" that they do not provide an adequate measure of reliability. The fact that a dog and its handler have been certified by a credentialed organization specializing in canine search and rescue is only one of many circumstances that a trial court may considered in determining whether the foundational requirements for admissibility of proffered dog-scent evidence have been met. If the evidence is allowed, it is only one of many circumstances that may be considered by the jury in deciding the weight to give the evidence.

Defendant, therefore, has not shown any error in the trial court's failure to insert a cautionary admonition in CALJIC No. 2.16.

### b. *Lessening of the Burden of Proof*

Defendant claims there is a further problem with CALJIC No. 2.16. Defendant contends the instruction is deficient because it fails to relate the issue of dog-scent evidence to the standard of proof beyond a reasonable doubt. According to defendant, to avoid lessening the prosecution's burden of proof, CALJIC No. 2.16 should include further language along the lines used in current CALCRIM No. 376 [Possession of Recently Stolen Property as Evidence of a Crime], which closes with the following admonition: "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

CALJIC No. 2.16, regarding dog-scent evidence, bears substantial similarity to the standard pattern instructions (CALJIC No. 2.15; CALCRIM No. 376), concerning a jury's consideration of evidence of a defendant's possession of recently stolen property. CALJIC No. 2.15 and CALCRIM No. 376 both instruct a jury that the defendant's conscious possession of recently stolen property is not by itself sufficient to permit an inference of the defendant's guilt and that there must be other corroborating evidence of the defendant's guilt before guilt may be inferred. (CALJIC No. 2.15; CALCRIM No. 376.) Similarly, CALJIC No. 2.16 instructs the jury that evidence of dog tracking that shows a defendant to be the perpetrator of a charged crime is not by itself sufficient to permit an inference of the defendant's guilt and that there must be corroborating evidence

that either supports the accuracy of the dog scent evidence itself or independently supports the identification of the defendant as the perpetrator. The instructions differ in that both CALJIC No. 2.15 and CALCRIM No. 376 instruct the jury that the corroborating evidence need only be "slight." CALJIC No. 2.16 does not include that language.

Like CALJIC No. 2.16, CALJIC No. 2.15 contains no language similar to the closing reminder in CALCRIM No. 376 regarding the beyond a reasonable doubt standard of proof. Nevertheless, as defendant recognizes, we have rejected the argument that CALJIC No. 2.15 erroneously lessens the prosecution's burden of proof. We have found that "there is nothing in the instruction that directly or indirectly addresses the burden of proof, and nothing in it relieves the prosecution of its burden to establish guilt beyond a reasonable doubt." (*People v. Parson* (2008) 44 Cal.4th 332, 355-356.) Moreover, we determined, "given the court's other instructions regarding the proper consideration and weighing of evidence and the burden of proof, there simply 'is "no possibility" CALJIC No. 2.15 reduced the prosecution's burden of proof.' " (*Id* at p. 356.) Subsequently, in *People v. Moore* (2011) 51 Cal.4th 1104, we explained that the trial court's giving of CALJIC No. 2.15, although erroneous in applying the "slight" corroboration rule to a murder charge, "in no way altered the trial court's proper instructions concerning the elements of [the charged offense] that the prosecution was required to prove beyond a reasonable doubt. The jury was instructed it could draw merely 'an inference of guilt' from the fact of possession with slight corroboration, which any rational juror would understand meant he or she could consider this inference in deciding whether the prosecution has established the elements of [the

charged offense] elsewhere defined in the trial court's instructions. The instruction purported to explain to the jury its proper consideration of a particular item of circumstantial evidence in reaching a verdict on the charges; it did not alter the defining elements of those charges." (*Id.*, at p. 1131.)

Defendant asks that we reach a different conclusion with respect to CALJIC No. 2.16 in light of the CALCRIM committee's decision to add to CALCRIM No. 376 the closing reminder regarding the burden of proof and in light of his assertion that dog-scent evidence is "typically unreliable." Contrary to defendant's view, however, the additional language of CALCRIM No. 376 does not reflect a legal inaccuracy or deficiency in CALJIC No. 2.16. CALJIC No. 2.16 provided the jury with instructions regarding an inference that the jury might draw from this particular item of circumstantial evidence but did not alter the court's other instructions concerning the necessity of proof beyond a reasonable doubt. (CALJIC Nos. 2.01, 2.90.) And, as explained in the previous section, courts have treated dog-scent evidence that has passed the stringent foundational requirements for admission into evidence as not "inferior or untrustworthy." (*Malgren, supra*, 139 Cal.App.3d at p. 241.) Defendant fails to persuade us that our previous rejection of this argument in the context of CALJIC No. 2.15 should not be applied by analogy to CALJIC No. 2.16. Doing so, we reject defendant's claim of error.

### 11. *The Trial Court's Refusal to Modify CALJIC No. 2.51*

The trial court instructed the jury with CALJIC No. 2.51 that "[m]otive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. Presence of motive may

tend to establish the defendant is guilty.  Absence of motive may tend to show the defendant is not guilty."  The trial court denied defendant's request to add language instructing the jury that "motive is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

Pointing to other instructions that contain language cautioning the jury that certain evidence is not sufficient to establish guilt, including CALJIC Nos. 2.15 and 2.16, defendant argues that it was error for the trial court to refuse his request. Defendant contends that under the specific circumstances of this case, in which inflammatory images of child pornography were offered as evidence of motive, the additional language was not only salutary, but necessary.

This court has previously rejected the argument that it is necessary to instruct the jury that motive alone is insufficient to establish guilt.  We have explained that if CALJIC No. 2.51 " 'somehow suggested that motive alone *was* sufficient to establish guilt, defendant's point might have merit.  But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of murder.  When CALJIC No. 2.51 is taken together with the instruction on the concurrence of act and specific intent (CALJIC No. 3.31) and the instruction outlining the elements of murder and requiring each of them to be proved in order to prove the crime (CALJIC No. 8.10), there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish guilt of murder.' " (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168 (*Livingston*), quoting *People v. Snow* (2003) 30 Cal.4th 43, 97-98 (*Snow*).)

115

Defendant argues that because *Livingston, supra*, 53 Cal.4th at page 1168, involved a claim that the trial court had a duty to modify CALJIC No. 2.51 on its own motion, it is not authority for rejecting his contention that the trial court erred in denying his *request* for the additional language. However, nothing in *Snow* or *Livingston* suggests our rejection of the argument was limited to claims concerning the trial court's duty to instruct on its own motion. Indeed, the defendant in *Livingston* noted that the court had instructed the jury in his case regarding flight, using the language of CALJIC No. 2.52, which told the jury that evidence of flight is not sufficient by itself to establish guilt. Livingston contended that "the failure to so state regarding motive would cause the jury to believe that motive alone *was* enough to convict." (*Livingston, supra,* 53 Cal.4th at p. 1168) As relevant here, we found there was no error and no prejudice. We stated: "The court fully instructed the jury on the reasonable doubt standard. We find no reasonable likelihood the jury would infer from the motive instruction that motive alone could establish guilt. Moreover, given the strong evidence of guilt aside from motive, the jury certainly did not base its verdicts solely on motive." (*Id.*, at p. 1169.) The same can be said here.

### 12. *Sufficiency of the Evidence of Forcible Asportation Underlying the Kidnapping Conviction*

Defendant contends that the evidence presented at the guilt phase of trial was insufficient to support his conviction of kidnapping under section 207 — and therefore his conviction of felony murder predicated on kidnapping — because there was assertedly no evidence that Danielle was removed from her house by force or fear. Defendant emphasizes that there is no evidence showing how Danielle was taken, no evidence of a

disturbance or commotion noticed by those at the house or the family dog, and no trace evidence linking defendant to the interior of the Van Dam home. He contends, therefore, that the circumstances amount to a taking effected by fraud or deceit, which does not constitute kidnapping within the meaning of section 207. (See *People v. Majors* (2004) 33 Cal.4th 321, 327-328.) Defendant further asserts that the record contains no evidence of later use of force or exploitation of fear. We reject defendant's sufficiency of the evidence claim.

Defendant was charged with kidnapping Danielle in violation of section 207, subdivision (a), which provides that "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." (§ 207, subd. (a).)

"As can be seen by this language, in order to constitute section 207(a) kidnapping, the victim's movement must be accomplished by force or any other means of instilling fear." (*People v. Majors, supra*, 33 Cal.4th at p. 326.) Defendant's jury was instructed accordingly with CALJIC No. 9.50, which in relevant part, told the jury that "[i]n order to prove this crime," it must be proved that "[a] person was unlawfully moved by the use of physical force, or by any other means of instilling fear[.]" Defendant points out that "asportation by fraud alone does not constitute general kidnapping in California." (*People v. Davis* (1995) 10 Cal.4th 463, 517, fn. 13.)

In evaluating a claim regarding the sufficiency of the evidence, we review the record "in the light most favorable to the judgment below to determine whether it discloses

substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11, citing *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320; accord *People v. Castaneda* (2011) 51 Cal.4th 1292, 1322.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez, supra,* 20 Cal.4th at p. 11; accord *People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020.) "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).)

There is no dispute that seven-year-old Danielle was removed from her bedroom in the Van Dam home sometime between 10:30 p.m. on February 1, after her father Damon first went to bed, and 9:00 a.m. on February 2 when she was discovered to be missing. We agree with the People that the jury could have reasonably inferred that defendant abducted Danielle by either using force to quietly subdue her or by

118

threatening her with harm if she made any noise. Although it is possible that defendant persuaded or tricked Danielle into secretly leaving with him, even assuming such a possibility reasonably exists, it simply presents a contrary view of the evidence. Reversal is "not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Lindberg, supra*, 45 Cal.4th at p. 27.)

More important, even assuming Danielle had been moved by a ruse and not through force or fear, the evidence was sufficient to support defendant's conviction for kidnapping. Danielle's status as a young child is significant because we have long recognized an alternative standard for such victims for purposes of kidnapping under section 207. We have held that the kidnaping of a minor can be accomplished without the same kind of force or fear applicable to adult victims provided that it was done for an improper purpose, because a minor is "too young to give his [or her] legal consent to being taken." (*People v. Oliver* (1961) 55 Cal.2d 761, 764 (*Oliver*).) Accordingly, we have construed section 207, "as applied to a person forcibly taking and carrying away another, who by reason of immaturity or mental condition is unable to give his [or her] legal consent thereto, . . . [to constitute] kidnaping only if the taking and carrying away is done for an illegal purpose or with an illegal intent." (*Oliver*, *supra*, 55 Cal.2d at p. 768.) In *Oliver*, we applied this construction of section 207 to the taking of a two-year-old child. We later applied the same construction to the takings of even younger children. (See *People v. Hill* (2000) 23 Cal.4th 853, 857-858 [seven-month-old]; *In re Michele D.* (2002) 29 Cal.4th 600, 607 (*Michele D.*) [12-month-old].)

Moreover, at the time of defendant's trial, the use note for CALJIC 9.50 described the exception we established in *Oliver*:

"If the victim of the alleged kidnapping is incapable of giving consent, the *People* must prove the movement was done for an illegal purpose or with an illegal intent." (CALJIC No. 9.50 (1999 rev.) (6th ed. 1996), citing *Oliver, supra,* 55 Cal.2d at p. 768.) Thus, it was well-established at the time of defendant's trial that the forcible taking language of section 207 as charged against defendant involves an alternative standard when the child victim is "too young to give his [or her] legal consent to being taken." (*Oliver, supra,* 55 Cal.2d at p. 764.)

Consequently, even if Danielle was persuaded into leaving her home, she could not have legally consented and was still kidnapped if she was taken away a substantial distance for an illegal purpose or with an illegal intent. Kidnapping is, moreover, a continuous offense. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159 [kidnapping continues "until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety"].)

The evidence indicated that defendant had moved Danielle. The mitochondrial DNA profiles of six hairs recovered from the master bedroom of defendant's residence matched Danielle's mitochondrial DNA profile, suggesting she had been in defendant's bedroom. According to the latent fingerprint examiner, the handprint Danielle left on the cabinet above defendant's motorhome bed showed pressured movement of her hand. Moreover, the mitochondrial DNA profiles of two hairs recovered from the floor of defendant's motorhome matched Danielle's mitochondrial DNA profile, and a third hair found in the motorhome sink matched Danielle's more distinct nuclear DNA profile, all of which further support her presence in defendant's motorhome. Viewing the evidence in a light most favorable to the judgment, these circumstances suggests she

was alive at some point when defendant drove the motorhome to various locations. Thus, defendant's movement of Danielle — likely to his house and certainly in his motorhome — continued the kidnapping.

Defendant suggests, however, that this recognized exception to the force requirement of section 207 has been applied to only the takings of infants, and not older children such as Danielle. But the Courts of Appeal have applied *Oliver* to child victims with ages similar to seven-year-old Danielle. (See *People v. Dalerio* (2006) 144 Cal.App.4th 775, 782 [nine-year-old]; *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392, 403, fn. 3 [seven-year old]; see also *People v. Ojeda-Parra* (1992) 7 Cal.App.4th 46, 50 [three-year-old].) As a result, the record overwhelmingly meets the standard of force as we apply it to children, given that Danielle was removed from her house without her parents' consent and moved from there to where her body was eventually found.

Defendant further objects, however, to the application of the standard of force described by the *Oliver* line of cases on the grounds that "this alternate theory of forcible kidnapping" was not alleged against him and the jury was not instructed on this alternative theory. He contends that these circumstances also contributed to the insufficiency of the evidence to support his conviction for kidnapping because a conviction cannot be affirmed on appeal on a factual theory never tried before a jury.

Concerning the alleged pleading error, defendant's argument is inapt because *Oliver* and *Michele D.*, and the other related cases described above, did not create a new or different crime of kidnapping that needed to be expressly pleaded against

the defendant. Instead, these cases simply applied an alternative standard in kidnapping cases involving children.

Moreover, the information made clear that defendant was being charged with the kidnapping of a child. In fact, defendant concedes that his kidnapping charge alleged that Danielle was "a child under the age of fourteen years." In a similar context, we have held that "an accusatory pleading charging murder need not specify the theory of murder upon which the prosecution intends to rely." (*People v. Abel* (2012) 53 Cal.4th 891, 937.) Here, the information filed against defendant, if anything, highlighted the theory of which he now complains by alleging the kidnapping of a child, thereby placing him on notice that the prosecution could rely on the theory of kidnapping used in *Oliver* and *Michele D.*

Nor does it matter for purposes of defendant's insufficiency of the evidence claim that the jury was not informed of the alternative standard applicable to the kidnapping of a child. The jury was instructed that, in order to convict defendant of kidnapping, the evidence must show that defendant moved Danielle using the standard threshold of force required for kidnapping, which is higher than the threshold of force we established in *Oliver*. Additionally, the jury's finding of guilt for the kidnapping charge necessarily indicates it believed she had been moved against her will, either by force or by inducing fear, or both.

Thus, if the jury concluded that Danielle had accompanied defendant out of fear, then any definition of force, alternatively defined or not, was irrelevant to defendant's conviction for kidnapping. On the other hand, if the jury concluded that a seven-year old would have made some effort to resist but was

overcome through defendant's use of force to move her, then the alternative definition of force under *Oliver* is also irrelevant to defendant's conviction for kidnapping. Consequently, with the understanding that the showing of force required for a child victim like Danielle is greatly reduced, there is no doubt that, construing the facts most favorable to the judgment, any rational trier of fact could have reasonably inferred from the evidence that Danielle had been removed from her home against her will for purposes of kidnapping.

Admittedly, however, defendant's jury was not instructed that it must find Danielle was taken and carried away "for an illegal purpose or with an illegal intent." We have recognized the importance of the "illegal purpose or illegal intent" requirement that was established in *Oliver*, *supra*, 55 Cal.2d at page 764, because, without such a requirement in cases involving children, "every time a person picks up and moves a child, he or she could be charged with kidnapping." (*Michele D.*, *supra*, 29 Cal.4th at p. 612; *Oliver, supra,* 55 Cal.2d at p. 768 ["So construed the legislative purpose will be preserved and furthered, and innocent persons who cannot have been within the legislative intention in adopting section 207 will be excluded from the operation of the law"].)

Although this element concerning the *Oliver* theory of kidnapping was not presented to the jury, any asserted error was harmless under either the state or federal constitutions. (See *Neder v. United States* (1999) 527 U.S. 1, 17 [under the federal constitution, the failure to instruct the jury on an element of the crime is reviewed for whether the error was harmless beyond a reasonable doubt]; *People v. Cole* (2004) 33 Cal.4th 1158, 1208, citing *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [under the state constitution, the inquiry is whether there

is no reasonable probability that the outcome of defendant's trial would have been different had the trial court properly instructed the jury].)  Defendant relied on an alibi defense and made no claim asserting that Danielle willingly left her home with him on the night of February 2, 2002.  More important, the record reflects there could have been no possible lawful purpose for surreptitiously removing seven-year-old Danielle from her home without her parents' knowledge and consent.  There was no fire or other emergency, for example.  There can be no other reasonable interpretation of the evidence that shows, or remotely suggests, defendant took Danielle for a lawful purpose.  And this is all that the law requires.

### 13.  The Trial Court's Failure to Instruct on Second Degree Murder and Involuntary Manslaughter as Lesser Included Offenses of First Degree Felony Murder

Over defendant's objection that the jury should also be instructed on first degree premeditated murder, the trial court instructed the jury on first degree felony murder only, and his liability for murder was tried solely on that basis.  Defendant contends the trial court had a duty to instruct on second degree murder and involuntary manslaughter as lesser included offenses on the court's own motion.  For his claim that second degree murder is a lesser included offense of first degree felony murder, defendant relies on our discussion of the law regarding second degree felony murder in *People v. Chun* (2009) 45 Cal.4th 1172.  Defendant contends the failure to instruct on the lesser included offenses constituted both state law error; and a violation of his constitutional rights under the Eighth Amendment. (*Beck v. Alabama* (1980) 447 U.S. 625, 638)

As defendant observes, we have previously declined to address the question of whether second degree murder is a lesser included offense of first degree felony murder. (*People v. Castaneda*, *supra*, 51 Cal.4th, at pp. 1328-1329 (*Castaneda*); *People v. Romero* (2008) 44 Cal.4th 386, 402; *People v. Valdez*, *supra*, 32 Cal.4th, at p. 114, fn. 17.) We do so again here. Even assuming for purposes of argument that second degree murder, and involuntary manslaughter, are lesser included offenses of first degree felony murder, we conclude that the trial court did not error in failing to instruct the jury on them here.

" '[I]t is the "court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*." [Citation.]' [Citations.]" (*Castaneda, supra*, 51 Cal.4th, at p. 1327, italics added.) "Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 941.) " '[T]he existence of "*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . .' [Citation.] Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] ' " 'Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' " ' [Citation.]" (*People v. Valdez, supra*, 32 Cal.4th at p. 116 fn. omitted.)

We conclude that there was no substantial evidence introduced at defendant's trial that the killing of Danielle was other than a murder during the commission of a kidnapping. First, to the extent defendant's argument that the jury could have concluded he was guilty of only second degree murder or

involuntary manslaughter relies on his view of the evidence of forcible asportation for purposes of kidnapping, as discussed and rejected in the previous section, we find it purely speculative in this context. Second, as we have previously explained, it was uncontested that Danielle was taken from her home during the night without her parents' consent. Someone kidnapped her. Defendant contended that he was neither her abductor nor her killer. But blood and trace evidence showed Danielle's presence in defendant's home, SUV, and motorhome. Her naked, animal-ravaged body was subsequently found off the side of a road in a remote part of San Diego County miles away from her home. There was no evidence from which the jury could find, for example, that defendant simply came upon her and killed her where her body was found, warranting instructions on the assumed lesser included homicide offenses.

### 14. *The Trial Court's Refusal to Instruct the Jury on First Degree Premeditated Murder*

As just noted, the prosecution tried this case solely on a first degree felony murder theory. The trial court denied defendant's request to instruct the jury on premeditated and deliberate murder, finding that there was no substantial evidence to support that theory. Defendant argues that the trial court erred. He contends the jury could have drawn an inference from the evidence that defendant put thought and planning into Danielle's abduction, transportation, and later in the disposal of her body and on that basis, the jury could have found him guilty of first degree premeditated murder. Defendant claims prejudice from the trial court's refusal to instruct on premeditated murder because it concomitantly denied him the right to instructions on the lesser included offenses of second degree murder and involuntary manslaughter.

The inference of premeditation and deliberation defendant argues contradicts the position taken by the defense at trial. There, defense counsel argued that the jury should be instructed on premeditated first degree murder because the evidence warranted a jury finding that defendant was the killer, yet not Danielle's kidnapper. That position was not supported by the evidence, as we have explained, and the trial court did not err in refusing to instruct the jury on premeditated murder, or its lesser included offenses, on that basis.

Moreover, assuming for purposes of argument that the jury could have drawn the inference defendant now urges based on the circumstances of defendant's kidnapping, transportation, and disposal of Danielle's body, the jury would also have necessarily found that defendant committed the murder during the commission of a kidnapping. There would have been no evidentiary basis for a finding by the jury that defendant killed Danielle with premeditation and deliberation, but did not do so her during the commission of the kidnapping. Thus, at most defendant has shown that the jury might have found him guilty of both first degree felony murder and first degree premeditated murder, not that there was substantial evidence on which the jury could have found him guilty of *only* lesser offenses to premeditated murder. Under these circumstances, defendant could have suffered no prejudice from the trial court's refusal to instruct on a supplementary theory of first degree murder.

## B. Penalty Phase Issues

### 1. *Admission of the J.N. Incident as Factor (b) Evidence*

Factor (b) of section 190.3 permits the jury, in determining the penalty in a capital case, to consider "[t]he presence or

absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Factor (b) evidence "shows the defendant's propensity for violence, and helps jurors decide whether [the defendant] deserves to die." (*People v. Stiteley* (2005) 35 Cal.4th 514, 564.)

The prosecution proffered evidence of an incident involving defendant's niece, J.N., as factor (b) aggravating evidence. As recounted earlier, J.N. described an incident, when she was between five and seven years old, involving defendant placing his fingers into her mouth and rubbing or massaging her teeth while she had been sleeping. J.N. testified that she first pretended to be asleep during the initial touching, but she bit him the second time he touched her teeth. J.N. thereafter told her mother that defendant had behaved "weird," and that it bothered her. Years later, when Officer Redden asked defendant if anyone might think defendant was involved in the kidnapping of Danielle, defendant recalled the incident involving J.N. and said that her mother had accused him of molesting J.N..

The defense objected that the incident at most constituted a "technical battery" and was not a crime of force or violence. The prosecution took the position that defendant had committed an assault and battery, as well as a lewd act in violation of section 288. The trial court agreed with the prosecution that the incident constituted a crime of force or violence that was admissible at the penalty phase and allowed J.N. to testify regarding it.

Defendant claims on appeal that the trial court erred. He contends first that the court misinterpreted section 190.3, factor

(b), to require only the amount of force necessary for a battery, i.e., the slightest touching done in an offensive manner. (See *People v. Rocha* (1971) 3 Cal.3d 893, 899-900, fn. 12; CALJIC No. 16.141; CALCRIM No. 960.) Defendant argues that "force or violence" as used in factor (b) must instead be construed to mean "forcible violence" or "violent force." Applying such a standard, defendant contends that the J.N. incident could not qualify as anything more than a "non-factor (b) battery" and that its admission into evidence constituted a violation of due process.

Factor (b) is not limited in all circumstances to acts as to which the defendant has used forcible violence or violent force. We have stated previously that "[f]or the purpose of admissibility under section 190.3, factor (b): ' "[T]he 'force' requisite . . . does not mean bodily harm but the physical power required in the circumstances to overcome [the victim's] resistance." ' " (*People v. Raley* (1992) 2 Cal.4th 870, 907 (*Raley*).) But how that standard would apply to the unwanted touching here is not entirely clear.

"Force or violence" for purposes of factor (b) has a conventional and commonsense meaning. (*People v. Dunkle* (2005) 36 Cal.4th 861, 922 (*Dunkle*), citing *Tuilaepa v. California* (1994) 512 U.S. 967, 975.) Those circumstances may include an inequality in size between the defendant and victim as an element of physical power. (*Raley, supra*, at p. 907.) When the victim is a child, for example, the child may be too surprised, shocked, or intimidated by the defendant to offer much, if any, resistance. (See *People v. Soto* (2011) 51 Cal.4th 229, 243 [children are uniquely susceptible to abuse because of their dependence upon adults, their smaller size, and relative

naiveté].)  Here, the victim was between five and seven years old when defendant placed his fingers in her mouth.

Defendant argues that, even so, we should find that the trial court erred in admitting the evidence.  We review " 'a trial court's decision to admit "other crimes" evidence at the penalty phase . . . for abuse of discretion, and no abuse of discretion will be found where, in fact, the evidence in question was legally sufficient.' " (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 225; accord *People v. Bacon* (2010) 50 Cal.4th 1082, 1127.)

Defendant argues that the evidence here was legally insufficient to support the trial court's exercise of its discretion and that its admission constituted an abuse of discretion.  In defendant's view, there is nothing in the record reflecting that when he put his fingers into J.N.'s mouth, he used any physical power to overcome resistance that was offered by J.N. as she slept or feigned sleep.  He emphasizes J.N.'s memory was of his rubbing or massaging her teeth, not his use of any "force" in putting his fingers into her mouth.  The People respond that defendant's conduct was not only a battery, but a touching of the body of a child under the age of 14 with sexual intent, that is, a lewd act on a child, in violation of section 288, subdivision (a) (section 288(a)).  Moreover, in the view of the People, defendant's acts were more than a touching for purposes of section 288(a) or a slight offensive touching for purposes of battery. The People argue that an adult's insertion of a finger into a sleeping child's mouth is a forceful act.  The People characterize it as an "attack."

We need not decide whether, under these standards, the touching here involved the use of force for factor (b) purposes. Even if the evidence was improperly admitted, we conclude that

the record does not demonstrate prejudice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1170.) The jury had already convicted defendant of the abduction and murder of seven-year-old Danielle. It had found true the special circumstance of a murder committed during the commission of a kidnapping. The jurors had heard all of the circumstances of the crimes and special circumstance, which involved the snatching of a very young girl from the safety of her bedroom in the middle of the night, her subsequent murder, and the dumping of her naked body out in the desert. The jury learned of defendant's likely sexual motivation for the kidnapping through the child pornography evidence. The jury heard evidence regarding the impact of defendant's crimes on Danielle's family and teachers. (§ 190.3, factor (a).) The evidence admitted in aggravation in our view was significant and, contrary to defendant's assertion, the case in mitigation was, by comparison, not particularly substantial. It reflected defendant's outward positive contribution to society and value to his coworkers, employers, friends, and family. But such evidence did not significantly address or undermine the evidence of defendant's apparent inner sexual compulsions toward young girls. Defendant fails to persuade us that the defense entomological evidence was so strong that it necessarily raised a lingering doubt concerning his guilt. The entomological evidence was seriously called into doubt through the rebuttal evidence introduced by the prosecution. And the J.N. incident itself was subject to reasonable questions and ambiguities, which may explain the jury's request early during its penalty phase deliberations for a reread of the relevant testimony regarding that incident. Nothing in the record suggests the jury ultimately relied on that evidence in reaching its penalty verdict or that it tipped the scale in favor of death. Under these

circumstances, we are confident that under any standard, the admission of the J.N. incident, if erroneous, was harmless.

### 2. *The Labeling of the J.N. Incident as a Lewd Act with a Child*

CALJIC No. 8.87 instructs the jury on consideration of other criminal activity by the defendant involving the use of force or violence as an aggravating circumstance. When the parties discussed the penalty phase jury instructions, defendant requested that, if the jury was to be instructed with CALJIC No. 8.87, the evidence of the J.N. incident should be labeled a battery and that the jury be separately instructed on the elements of battery. The prosecution took the position that the J.N. incident was not only a battery, but also a lewd act upon a child under 14 in violation of section 288(a). The prosecution requested that the jury also receive instructions regarding the elements of section 288(a). The defense opposed the prosecution's requests, contending that a violation of section 288(a) is not a factor (b) crime because it can be committed without the use of force or violence. The trial court observed that it had previously rejected defendant's argument. It tentatively ruled that both battery and lewd act on a child would be identified in the version of CALJIC No. 8.87 given to the jury and that the jury would be instructed on the elements of both crimes. The trial court later confirmed that the instruction would name both crimes, but offered defendant the choice of

whether the trial court should instruct on their elements.[10] The defense ultimately requested that no instruction be given on the elements of either of the designated crimes. Over defendant's objection, the jury was instructed with CALJIC No. 8.87, identifying battery "and/or" lewd act with a child under 14 years old as defendant's asserted criminal acts.[11]

Defendant argues that even if the J.N. incident was admissible as a factor (b) crime, labeling it as a lewd act with a child was unduly prejudicial because that aspect of the conduct was irrelevant to the purpose of factor (b) and the incident could have been adequately identified as a battery. Defendant contends that the lewd act label risked distracting, misleading, inflaming, and provoking the jury to use the evidence as character evidence beyond that allowed by factor (b). Defendant

---

[10]  Subsequent to defendant's trial, we have expressly confirmed that a defendant is entitled to instructions on the elements of alleged other factor (b) crimes on request, but may make a tactical choice to forego them. (*People v. Brown* (2003) 31 Cal.4th 518, 571.)

[11]  The full version of CALJIC No. 8.87 given to the jury stated that: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts:  battery and/or lewd act with a child under fourteen years, which involved the express or implied use of force or violence.  Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit the criminal acts.  A juror may not consider any evidence of any other criminal acts as an aggravating circumstance.  [¶]  It is not necessary for all jurors to agree.  If any juror is convinced beyond a reasonable doubt that the criminal activity occurred, that juror may consider that activity as a fact in aggravation.  If a juror is not so convinced, that juror must not consider that evidence for any purpose."

claims that it was far from clear that a violation of section 288(a) had even occurred and that the jury was prevented from reasonably and rationally assessing the event because of the trial court's instruction that "if" anything happened, it was a lewd act with a child under 14 years.

To the extent defendant's argument suggests that a violation of section 288(a) cannot constitute factor (b) evidence, we reference our previous discussion and expressly reject the claim that section 288(a) is categorically outside of the scope of factor (b). A violation of section 288(a) may under the circumstances be a crime involving force or violence or the implied or express threat of force or violence within the meaning of factor (b). (*Raley, supra*, 2 Cal.4th at p. 907.) We have concluded that the trial court did not abuse its discretion in determining that to be the case here.

To the extent defendant's argument is premised on a view that his conduct may not have constituted a violation of section 288(a), we find substantial evidence in the record to support a rational juror's finding that defendant put his fingers in J.N.'s mouth and massaged her teeth with the requisite sexual intent. Defendant's tactical decision to forego instructions on the elements of section 288(a) waived his right to the jury's determination of the issue.

With respect to purely the labeling of the J.N. incident as a lewd act on a child, we reject defendant's claim that the naming of it in the instruction prejudicially misled or distracted the jury from the proper focus of factor (b) evidence. CALJIC No. 8.87, as given, expressly told the jury that the evidence had been introduced for the purpose of showing that defendant had committed battery and/or a lewd act with a child involving the

use of force or violence. The jury was thus given the possibility of alternative crimes. It was not told that defendant's conduct was definitively criminal lewd conduct with a child. More importantly, its attention was specifically directed at the facts of defendant's past criminal conduct as involving the use of force or violence — the specific focus of factor (b).

Furthermore, accurately labelling defendant's conduct as a lewd act provided the jury with an appropriate legal description of defendant's criminal offense, if the jurors found that the conduct occurred. When evidence of a defendant's factor (b) conduct violates multiple criminal provisions, a court may identify those offenses for the jury. To the extent the cases defendant cites in support of his argument that a court must exercise its discretion to eliminate unnecessary labeling of factor (b) evidence (*People v. Schader* (1969) 71 Cal.2d 761, 775-775; *People v. Holt* (1984) 37 Cal.3d 436, 462 (dis. opn. of Bird, C. J.); *People v. Cardenas* (1982) 31 Cal.3d 897, 905; *People v. Avitia* (2005) 127 Cal.App.4th 185, 194) are apposite, we find no abuse of discretion in the trial court's decision here to name both offenses in the instruction.

Finally, for the same reasons given in the previous section finding harmless any error in the admission of the evidence concerning the J.N. incident, we similarly find any error in the trial court's labelling of defendant's criminal conduct in CALJIC No. 8.87 to be harmless. (See *People v. Collins* (2010) 49 Cal.4th 175, 219 [a factor (b) incident of marginal significance given an inappropriate label could not have affected the outcome within any reasonable possibility]; *People v. Clair* (1992) 2 Cal.4th 629, 681 [same].)

### 3. *Failure of CALJIC No. 8.87 to Submit the Question of Force or Violence to the Jury*

Defendant complains that CALJIC No. 8.87 improperly fails to submit to the jury whether the crime involved the use or threatened use of force or violence. Although this court has repeatedly rejected this claim (e.g., *People v. Streeter* (2012) 54 Cal.4th 205, 266; *People v. Loker* (2008) 44 Cal.4th 691, 745; *People v. Nakahara* (2003) 30 Cal.4th 705, 720 (*Nakahara*)), defendant asks us to reconsider our position in light of Evidence Code section 403.

Initially, we reject the People's argument that the issue is forfeited because defendant failed to renew, when jury instructions were discussed with the court, his written request to so modify the instruction. We note that even if defendant had completely failed to object at trial, we may review his claim on appeal to the extent his claim of instructional error affected his substantial rights. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 302.)

Nevertheless, on the merits, defendant fails to persuade us to reconsider our position that CALJIC No. 8.87 is not defective for failing to submit the question of force or violence for purposes of factor (b) other crimes evidence to the jury. As we have explained, "[t]he question whether the acts occurred is certainly a factual matter for the jury, but the *characterization* of those acts as involving an express or implied use of force or violence . . . [is] a legal matter properly decided by the court." (*Nakahara, supra*, 30 Cal.4th at p. 720.) In contrast, Evidence Code section 403 is concerned with a trial court's initial determination that sufficient evidence has been produced to show the existence of a preliminary fact necessary to support admission of proffered evidence, and the court's duty to instruct, on request, that the jury determine whether the preliminary

facts exists before it considers the evidence introduced. (*People v. Lewis* (2001) 26 Cal.4th 334, 362.) Evidence Code section 403, dealing with a *factual* determination, is inapplicable to the *legal* question involved here.

### 4. *Admission and Use of the Child Pornography Evidence at the Penalty Phase*

Defendant claims his death sentence must be reversed because of the assertedly erroneous admission of the child pornography evidence at the penalty phase of his trial.

Defendant first reasserts his claims that the trial court improperly joined the child pornography count to the other charges and erroneously admitted the pornography evidence at the guilt phase. He contends that the prejudicial effect of these errors was compounded in the penalty phase by admission of the evidence as part of the prosecution's case in aggravation and the prosecutor's references to it in his penalty phase closing argument. Because we have rejected defendant's claims of error in joinder and admission of the evidence (see *ante*, Part II.A.5 & Part II.A.6), there is no error to be compounded.

Defendant next contends that even if there was no error in joinder or in the guilt phase admission of the child pornographic evidence, nevertheless, the admission of the child pornography at the penalty phase as evidence in aggravation under factor (a) constituted independent error.

Factor (a) allows the jury to consider "[t]he circumstances of the crime of which defendant was convicted in the present proceeding and the existence of any special circumstances found to be true." (§ 190.3, factor (a).) Defendant argues that factor (a) evidence is limited under the statute to the circumstances of only the crimes that triggered the death penalty. Thus, he

claims, the evidence submitted to prove the joined count of possession of child pornography does not come within factor (a) and was improperly introduced as such. We have previously " 'assumed that factor (a), though it speaks in the singular of the "crime" of which defendant was currently convicted, covers the "circumstances" of *all* offenses, singular or plural, that were adjudicated in the capital proceeding.' " (*People v. Thomas*, *supra*, 53 Cal.4th, at p. 821, quoting *People v. Montiel* (1993) 5 Cal.4th 877, 938, fn. 33; accord *People v. Rogers* (2006) 39 Cal.4th 826, 909; *People v. Sanchez* (1995) 12 Cal.4th 1, 70.) Although defendant questions this assumption, we need not definitively resolve the issue here because the child pornography, along with the other pornography depicting children in cartoon and anime forms, was also properly admitted as evidence of defendant's motive in committing the kidnapping and murder of Danielle, that is, as evidence pertaining to the crimes that subjected defendant to the death penalty.[12]

---

[12] During his penalty phase closing argument, the prosecutor referred to all three convictions — the child pornography, the kidnapping, and the murder — as coming within the crimes covered by factor (a). The trial court overruled defendant's objection that this misstated the law. Defendant on appeal claims that the prosecutor's comment was a form of prosecutorial misconduct because it misrepresented the scope of factor (a). We disagree. At the time of defendant's trial, our cases generally construed factor (a) to cover all crimes alleged as part of the capital proceeding. (*People v. Sanchez, supra*, 12 Cal.4th at p. 70.) Moreover, even if it were otherwise, there is no reasonable possibility that the prosecutor's brief mention of the child pornography conviction prejudiced defendant given that the evidence underlying the charge could be considered as motive evidence relevant to the kidnapping and murder convictions. (*People v. Thomas, supra*, 53 Cal.4th at p. 821.)

In this regard, defendant contends that evidence of motive admitted at the guilt phase under Evidence Code section 1101, subdivision (b), is not properly considered a "circumstance" of the crime within the meaning of factor (a) because in this case it constituted neither "evidence relevant to 'the immediate temporal and spatial circumstances of the crime,'. . .[nor] additional evidence, like victim impact evidence, that ' "surrounds materially, morally, or logically" the crime." ' " (*People v. Tully* (2012) 54 Cal.4th 952, 1042.)  Defendant elaborates that even if motive itself could be a factor (a) circumstance, specific acts of conduct from which motive is inferable are not in themselves factor (a) circumstances.

On the contrary, we have previously concluded that consideration of a defendant's prior use of drugs is permissible under section 190.3, factor (a) to demonstrate that he killed the victim with the "particularly base motive" to obtain money to buy drugs.  (*People v. Osband* (1996) 13 Cal.4th 622, 708.) Similarly, here, defendant's prior interest in the depiction of sexual conduct with children, and sometimes violent sexual assault of children, as reflected by his specific action of possessing such pornography, provided evidence that logically connected to the jury's moral assessment of the crimes at the penalty phase.

In addition to arguing that the child pornography was improperly admitted as factor (a) evidence, defendant contends the prosecutor improperly and misleadingly urged the jury to also use the evidence as factor (b) evidence.  Defendant points to a portion of the prosecutor's closing argument in which the prosecutor told the jury that the J.N. incident reflected a beginning stage of defendant's fantasies, that those fantasies continued with defendant's possession of the pornography

depicting children, and ultimately progressed to the kidnapping and murder of Danielle. Not only did defendant fail to object to this portion of the prosecutor's argument, thereby forfeiting any claim of misconduct, we are not persuaded that any misconduct occurred. The record reflects that the complained-of prosecutorial comments came after the prosecutor identified the J.N. incident as the factor (b) evidence in this case. The prosecutor explained how that incident could fit into the jury's penalty consideration. Specifically, the prosecutor suggested that beginning with the J.N. incident, there was a pattern or "history" of defendant's sexual interest in children, which not only reflected defendant's fantasies and desires but should provide the jury with additional confidence that defendant committed the crimes against Danielle in the event the defense argued lingering doubt. The prosecutor stated that defendant "is not the saint he has been portrayed." Nothing in the prosecutor's argument urged the jury to view the child pornography as factor (b) evidence and no rational juror could have construed the argument as urging the jury to do so.

In sum, defendant has shown no error in the admission and use of the child pornography evidence at the penalty phase of his trial.

### 5. *Penalty Phase Prejudice from the Cross-Examination of Susan L.*

Defendant reminds us of his guilt phase claim that the trial court erroneously allowed cross-examination of Susan L. regarding an alleged "stalking" incident and her opinion concerning defendant's "forcefulness" after he had been drinking. (See *ante*, Part II.A.7.) Defendant now contends that even if we reject his claim of prejudicial error at the guilt phase, the use of such evidence at the penalty phase was prejudicial.

He argues that the evidence was responsive to none of the factors listed in section 190.3 and violated his right under the Eighth Amendment's heightened reliability requirement for capital cases.

Initially, we note the defendant failed to object to the prosecutor's closing argument regarding Susan L.'s testimony and so forfeited his claim that the prosecutor improperly used the evidence as a nonstatutory aggravating circumstance. (See *People v. Boyd* (1985) 38 Cal.3d 762, 772-776.) In any event, we agree with the Attorney General that the prosecution never asked the jury to consider this evidence as improper nonstatutory aggravating evidence. Rather, the prosecution used the evidence to rebut the penalty phase testimony of Susan L. and her daughter Christina G. that defendant had been kind, helpful, and generous to them. "A defendant who offers evidence of his or her good character widens the scope of the evidence of bad character that may be introduced in rebuttal. [Citation.] 'The scope of rebuttal legitimately embraces argument by the prosecutor "suggesting a more balanced picture of [the accused's] personality." [Citation.]' [Citation.]" (*People v. Cunningham, supra*, 25 Cal.4th 926, 1024; accord *People v. Hawthorne* (2009) 46 Cal.4th 67, 92.)

### 6. *Asserted Cumulative Error*

Although defendant contends that each of the penalty phase errors he has alleged is prejudicial standing alone, he also argues that any combination of the errors would also warrant reversal of the penalty judgment.

We have rejected defendant's claims of error. When we have alternatively assumed error, we have found each possible error also to be harmless. Considering the possible errors

together for the purposes of this claim, we also conclude that their cumulative effect does not warrant reversal of the judgment. (*People v. Panah* (2005) 35 Cal.4th 395, 479-480.)

### 7. *Victim Impact Evidence*

Defendant claims the trial court erred in allowing, over defense objection, Danielle's teachers to testify regarding Danielle's character and contributions, and to the effect of her murder on themselves and Danielle's classmates. Defendant asserts that the abduction and murder of "a middle-class young girl, living happily with her brothers and parents in a nice, safe neighborhood in San Diego" was itself sufficient victim impact evidence and anything more "could only irrationally exploit feelings that would be extremely close to the surface in any event."

It is well settled that the prosecution may introduce victim impact evidence in the penalty phase of a capital case. " 'Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a).' (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057.) 'The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." ' (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825.)" (*People v. Cruz* (2008) 44 Cal.4th 636, 682.)

"The purpose of victim impact evidence is to demonstrate the immediate harm caused by the defendant's criminal conduct." (*People v. Pollock* (2004) 32 Cal. 4th 1153, 1183.) That harm is not limited to immediate family members. (*People v. Williams* (2015) 61 Cal. 4th 1244, 1285.) Friends, coworkers,

classmates, and teachers, may all be affected by the death of the victim under the specific circumstances of a case. (E.g., *ibid.* [coworkers]; *People v. Thomas* (2011) 51 Cal.4th 449, 507-508 [a friend and classmate]; *People v. Taylor* (2010) 48 Cal.4th 574, 645-646 [the director of an afterschool program at which the victim volunteered]; *People v. Ervine* (2009) 47 Cal.4th 745, 792 [the victim's work supervisor]; *People v. Dykes* (2009) 46 Cal.4th 731, 779-780 [the victim's teacher].) Here, defendant's shocking abduction and murder of seven-year-old Danielle caused emotional harm to her teachers and classmates. Our review of the record does not persuade us that her teachers' testimony regarding Danielle and those effects would invite a purely irrational response from the jury or that it rendered defendant's trial fundamentally unfair under the circumstances.

### 8. *Failure to Sequester the Jury as Constituting Penalty Phase Error*

Defendant contends the trial court's failure to sequester the jury at the guilt phase created prejudice reaching into the penalty phase, requiring reversal of the penalty judgment. In the alternative, defendant claims that, given the public's reaction to the guilty verdicts and the publicity surrounding the penalty phase, the trial court committed independent reversible error at the penalty phase by failing to sequester the jury at that time. We have found no error in the trial court's failure to sequester the jury at the guilt phase. (See *ante* Part II.A.4.) Therefore, there is no prejudice to carry forward to the penalty phase, and we reject defendant's initial claim. Reviewing the circumstances surrounding the penalty phase of trial (see *post*), we also find no abuse of discretion in the trial court's failure to sequester the jury at that time and therefore reject defendant's alternate claim.

### a. Penalty Phase Background

The guilt phase verdicts were announced in open court on August 21, 2002. The jurors were ordered to return on August 28 for the beginning of the penalty phase and were released with the standard admonition not to discuss the case or anything concerning their deliberations with anyone. They were directed to report to the court if anyone contacted or attempted to contact them about the case. The trial court denied defendant's renewed motion for sequestration with the comment that it had "every confidence [the jury] is abiding by the orders of this court." It noted that it had not "seen nor heard nor read anything to indicate otherwise."

After the jury's verdicts were announced, onlookers who were congregated around the courthouse let out a cheer that was televised along with the news of the verdicts. A photographer snapped a photograph of the Van Dams in the courtroom just as the verdict was announced in violation of court rules and the photograph appeared in a local newspaper a short time later. On the same day, in violation of the trial court's gag order, the San Diego Police Chief gave a news conference in which he commented on the handling of the matter by his department. The trial court initially considered issuing an order to show cause to the Police Chief, but decided that there was no meaningful sanction it could impose at the time and noted the Chief's comments were "fortunately" "limited in context." With respect to the offending photographer, however, the court barred that person from the balance of the trial.

When the jurors returned on August 28, they heard the victim impact evidence and the testimony of defendant's niece, J.N., concerning defendant touching her teeth while she slept.

In releasing the jury at the end of the day, the trial court noted that there were two professional sports games being televised that night, implicitly suggesting that the jury could safely watch the games to avoid seeing any televised news concerning the trial. The court had followed a similar pattern during the guilt phase by suggesting to the jury that it could watch television and still be insulated from outside influences by watching such sporting events. This time, however, the station televising the San Diego Chargers football game broadcast during halftime a report concerning the proceedings in defendant's trial. The report mentioned allegations of child molestation.

Defendant renewed his request for jury sequestration the next day based on the television coverage. The trial court denied his request, noting that if any jurors had inadvertently seen anything during the halftime report, it was not different from J.N.'s testimony that they had heard during the trial. When the jurors returned to the courtroom, the trial court observed that if any juror was watching the previous night's football game, he or she would have been exposed to some coverage of the trial at halftime. The court assumed, in line with its previous repeated admonitions to avoid watching any news coverage of the trial, that the jurors would have "just looked another way or [switched channels] to see how the Padres were doing." No juror indicated differently.

On the morning of the next day of trial, the defense asked to make a record of its investigation regarding a previously received second-hand report that Juror number 12 had said at work that he would not believe anything one of defendant's counsel said because he did not like counsel. (See *ante*, Part II.A.4.a.) The defense reported that its investigator was told that Juror number 12 had been essentially "tight-lipped" at

145

work and had said nothing. Juror number 12, however, became aware of the defense inquiries and, later that day, sent the court a note to ask why they had been made. The defense requested that the trial court bring Juror number 12 into the courtroom in order to assure him that nothing improper had been done by the defense. The court granted the request and Juror number 12 was called in.

The trial court explained to Juror number 12 that courts sometimes receive reports regarding the conduct of jurors, substantiated or not, and when such a situation arises, it is incumbent on the court to allow the parties to investigate. The court had received such a report from someone at Juror number 12's work that had caused some concern among both sides and the court had authorized each side to pursue the rumor in order to allay any concerns they might have. The defense had chosen to do so, but, the court explained, nothing in the results caused it any concern. The court then enquired of Juror number 12 whether there was anything about this situation that affected his ability to be fair and neutral. Juror number 12 responded that it did not affect him at all and repeated that assurance when asked a second time by the defense. After Juror number 12 left the courtroom, the defense renewed its motion to sequester the jurors. The trial court again denied the motion.

### b. *Discussion*

We earlier concluded, in accordance with our prior law, that a trial court's decision whether to sequester a jury is subject to an abuse of discretion standard of review. (See *ante*, Part II.A.4.b.) Applying that standard again to the trial court's decision not to sequester the jury during the penalty phase of trial, we find no error. Although defendant has demonstrated

that there was considerable ongoing public and media interest in this case, there is nothing in the record to indicate that the jury did not continue to abide by the trial court's repeated admonitions and orders to avoid exposure to the news and publicity concerning the case or that Juror number 12, or any other juror, misrepresented his or her ability to reach a penalty phase verdict on the trial evidence alone. We repeat that "we cannot assume on a silent record that [jurors] ignored [such orders and admonishments] and were exposed to prejudicial material." (*People v. Ruiz, supra*, 44 Cal.3d at p. 617.)

### 9. *Denial of Defendant's Challenge for Cause to Prospective Juror No. 19 As Effecting the Penalty Judgment*

Referring back to his guilt phase argument, defendant contends the trial court's assertedly erroneous denial of his challenge for cause to Prospective Juror number 19 requires reversal of the penalty judgment because it left the defense with no remedy for the allegedly improper retention of not only Juror number 4, but also of Juror number 2. Defendant claims that insofar as the record reflects that Juror number 2 was incompetent to sit as a juror in the penalty phase (*People v. Booker* (2011) 51 Cal.4th 141, 158; *Wainwright v. Witt* (1985) 469 U.S. 412, 424; *Witherspoon v. Illinois* (1968) 391 U.S. 510, 522, fn. 21), the error in denying the challenge for cause to Prospective Juror number 19 was prejudicial.

We have previously concluded that the trial court did not err in denying defendant's challenge for cause to Prospective Juror number 19, and we further concluded that, even assuming error, defendant has failed to show he was prejudiced by the retention of Juror numbers 2 and 4. (See *ante*, Part II.A.2.) Therefore, defendant fails to show that any error concerning

Prospective Juror number 19 prejudiced his penalty phase judgment.

### 10. *The Trial Court's Failure to Grant Additional Peremptory Challenges As Effecting the Penalty Judgment*

As part of his guilt phase arguments, defendant contends the amount of media and public attention focused on his case required, as a federal constitutional matter, that the trial court grant his requests for additional peremptory challenges. We have concluded that defendant's failure to cite pretrial publicity as a basis for his requests for additional peremptory challenges forfeited his claim on appeal. We have also determined that even if defendant had preserved his claim for appeal, we would reject it on the merits because defendant has not met his burden to show that he was likely to receive an unfair trial because of juror bias based on pretrial publicity. (See *ante,* Part II.A.3.)

Defendant reasserts his claim with respect to the penalty phase and contends that the trial court's failure to at least grant the defense requests for additional peremptory challenges rendered his penalty trial unfair. Pointing us to virtually the same portions of the record, he argues that the penalty judgment should be reversed. Again, we conclude defendant forfeited his claim by failing to raise it as a ground supporting his request for additional peremptory challenges. Defendant also fails to persuade us that, if we addressed the merits of his claim, we would reach a different conclusion for purposes of the penalty phase of this trial.

### 11. *Challenges to the Constitutionality of California's Death Penalty Law*

Defendant raises several challenges to California's death penalty scheme that we have previously considered and rejected. We find no persuasive reason to reexamine those conclusions and we therefore reject defendant's claims as follows:

Defendant contends California's death penalty statute fails to narrow the class of offenders eligible for the death penalty and thus violates the federal constitution. (*Furman v. Georgia* (1972) 408 U.S. 238.) In support, defendant has supplied a declaration from a law professor who in 1997 conducted a statistical study of California murder convictions for the five-year period 1988 to 1992. Defendant claims the statistics show that section 190.2 fails to sufficiently narrow the class of death-eligible defendants. On the contrary, we continue to conclude that " 'the statutory [death penalty] scheme "adequately narrows the class of murder for which the death penalty may be imposed [citation], and is not overbroad . . . because of the sheer number and scope of special circumstances [that] define a capital murder . . . ." ' [Citation.]" (*People v. Banks* (2014) 59 Cal.4th 1113, 1206-1207; *People v. Vieira* (2005) 35 Cal.4th 264, 303-304.)

Contrary to defendant's arguments, to reach a death verdict jurors do not have to find that death is the appropriate penalty using a beyond-a-reasonable-doubt standard of proof. (*People v. Banks*, *supra*, 59 Cal.4th at p. 1207; *People v. Melendez* (2016) 2 Cal.5th 1, 33.) Except for the verdict itself, there is no requirement that the jury unanimously agree on which aggravating factors apply. (*People v. Banks*, *supra*,

59 Cal.4th at p. 1207.) " 'Review for intercase proportionality is not constitutionally compelled.' " (*Ibid.*)

### III. DISPOSITION

We affirm the judgment.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**SLOUGH, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Westerfield
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S112691
**Date Filed:** February 4, 2019
_____

**Court:** Superior
**County:** San Diego
**Judge:** William D. Mudd

_____

**Counsel:**

Mark David Greenberg, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Holly D. Wilkens and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark David Greenberg
484 Lake Park Avenue, No. 429
Oakland, CA  94610
(510) 452-3126

Robin Urbanski
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA  92101
(619) 738-9115